(No. 37752.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ROBERT PALMER, Plaintiff in Error.

*Opinion filed May 20, 1964.*

DAVID S. CANTER, of Chicago, appointed by the court, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH and E. MICHAEL O'BRIEN, Assistant Attorneys General, and ELMER C. KISSANE and WILLIAM J. NELLIS, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE UNDERWOOD delivered the opinion of the court:

Defendant, Robert Palmer, was tried by a jury in the criminal court of Cook County where he was represented by the public defender, was found guilty of burglary and was sentenced by the criminal court of Cook County to a term of five to twenty years in the State penitentiary.

Defendant is here by writ of error seeking a review of that conviction under Supreme Court Rule 65—1. (Ill. Rev. Stat. 1961, chap. 110, par. 101.65—1), contending:

(1) that he was illegally arrested and detained, subjected to illegal searches and seizures, and denied counsel, contrary to the due process requirement of both the federal and state constitutions; (2) that his guilt was not proved beyond a reasonable doubt; and (3) that the trial court committed reversible error by admitting incompetent evidence and prejudicial argument.

Defendant frequently patronized the Crystal Inn, a tavern in Oak Forest, Illinois, located immediately across the highway from his trailer home. On the night of December 2, 1961, he was in the tavern from 10:00 P.M. until midnight, went home, returned about 1:30 or 2:00 A.M., and finally left again about 3:45 A.M. About 9:00 P.M., that evening, Hilbert Kampe, the tavern owner, took over the bartending chores from his regular bartender and long-time friend, Herman Jergens. Jergens left but returned about 11:00 P.M., and tended the bar for the rest of the evening. Kampe stayed on, chatting, and had about three drinks of whiskey. Both Jergens and defendant testified that Jergens shoved Kampe off his stool at about 3:30 A.M., during an argument in the presence of defendant and others. Some time later Kampe fell asleep at the northeast corner of the horseshoe-shaped bar. Jergens closed the bar at 4:30 A.M., locked all the doors and windows, swept the barroom and checked the kitchen, storeroom and washrooms. Kampe slept throughout this time and was sleeping when Jergens left at 5:30 A.M.

Kampe testified that some time later he was awakened by a noise and walked about 15 feet to the center of the barroom where he saw the defendant standing about 6 feet away; that he saw defendant's face; that defendant was wearing a leather jacket which was, or was like, People's exhibit No. 1; that he, Kampe, called defendant "Bob"; that defendant said, "Now, I have to kill you."; and that then defendant struck him about the head with a hard object a number of times. Kampe's next conscious moments oc-

curred when he arose from the floor calling for the bartender and knocking things around to make noise in order to attract attention because his eyes were so swollen he couldn't see.

Captain Maher and officer Boothe of the Oak Forest police arrived at the tavern about 6:05 A.M., in response to a telephone call received several minutes earlier. After looking in and seeing a man's face covered with blood, they broke open the west door, and found Kampe standing nearby. Kampe was sent by ambulance to a hospital where he remained in critical condition for some time. An examination of the interior of the barroom revealed scattered blood and a hammer and knife lying on the floor behind the bar amid broken bottles. The hammer was admitted as People's exhibit No. 2. The inside latches had been pulled off of two doors leading into the building. Herman Jergens then arrived on the scene and, with the officers, proceeded to the police station. Shortly after 7:00 A.M. Maher and Chief Perry went to the defendant's trailer and were admitted by his wife. They asked Palmer if he would go to the station for questioning and he consented. After he dressed, the officers took him to the station about 8:00 A.M. At approximately 8:30 A.M., after Maher, Perry and the defendant had been at the station for awhile, Maher sent officer Boothe to the trailer to get a pair of boots which had been seen under the bed while defendant was dressing. When Boothe brought in the boots 15 minutes later, Maher observed what he thought was dried blood on them. The boots were admitted as People's exhibit No. 3.

At about 1:30 P.M., Maher and Perry returned to defendant's trailer, and took a leather jacket belonging to the defendant from a closet. Maher observed what he thought to be dried blood stains on the front and arms thereof. They took the jacket back to the station, and at the trial it was admitted as People's exhibit No. 1. The officers had various conversations with defendant throughout the day.

At approximately 8:00 P.M., Maher and officer Clayhauer saw defendant's wife again and allegedly took a written statement.

Maher testified that he again talked with defendant alone at the lockup about 10:00 P.M., and that defendant asked him how Kampe was, to which he replied: "in critical condition", and asked defendant why he had hit Kampe. According to Maher, defendant said: "I didn't want to hit him. He made me. If I go up again, it will be for life." He also said that he had hit Kampe with just the hammer, not the trophy, but couldn't bring himself to stab him so threw down the knife and ran. Moreover, Maher testified that defendant said the crime laboratory wouldn't find fingerprints because he had worn gloves. Maher testified that when he first observed the hammer it appeared to have dried blood and hair on it which had worn away partially since then. On cross-examination Maher restated much of his prior testimony on direct examination, including his 10:00 P.M. conversation with defendant in the lockup during which the above alleged oral confession occurred. Maher testified that on other occasions defendant denied the crime, but Maher didn't recall when these conversations took place or whether there were other people present at those times, except that they took place before the alleged statement was obtained from Mrs. Palmer. Neither this statement nor the substance thereof was ever admitted into evidence.

A microanalyst for the Chicago police laboratory testified that tests which he performed on People's exhibit No. 1, the jacket, indicated that the stains thereon were human blood, but no tests had been run to determine the blood type. No tests were run on the boots or hammer. An officer of the mobile crime laboratory who investigated the tavern premises late in the afternoon of March 3, testified that the hammer which he found behind the bar, People's exhibit No. 2 appeared to have blood and hair thereon when he examined it the first time.

Defendant testified that he was married, had a baby daughter, and had pleaded guilty to armed robbery in 1960 and was on probation for 5 years; that for several months he had been a patron of the Crystal Inn; was there on the evening of December 2-3 from about 8:00 or 9:00 P.M. until 11:45 P.M., and again from 1:30 A.M. or 2:00 A.M. until about 3:45 or 4:00 A.M.; that Jergens had reached over the bar and hit or pushed Kampe off his stool about 3:30 A.M.; and that both Kampe and Jergens had drinks while he was at the tavern. He went directly home to bed after last leaving the tavern but later saw lights and people around that building at 5:30 A.M. when he got up for the baby's bottle. He said his wife also saw this activity. Then he related the facts of his being taken into custody on December 3, and also testified that at the police station he had been questioned several times that day concerning the crime. Palmer testified that Maher and Perry kept trying to get him to admit the crime, saying if Kampe should die that he, Palmer, by signing a statement, would be better off. However, defendant said he continually denied the crime, and also denied having made any kind of oral confession.

It was also established that defendant was an apprentice welder at the time of his arrest and in his work used ordinary ball-peen hammers, such as People's exhibit No. 2, although he did not own such a hammer.

Mrs. Palmer testified that People's exhibit No. 1, the jacket, looked like her husband's jacket and that Captain Maher had taken it from the closet in the trailer.

Chief of Police Perry testified that he saw and conversed with Palmer 3 or 4 times on December 3, first in his trailer then several times at the station. He denied ever saying to the defendant that if Kampe died he would be charged with murder so it would be a good idea to sign a statement. Chief Perry testified that he only asked defendant why he wouldn't tell the truth and give a statement.

As to the contention that defendant's arrest without a

warrant and his subsequent detention violated his State and Federal constitutional rights, the Criminal Code of Illinois provides that an officer of the law may make an arrest without a warrant, "* * * when a criminal offense has in fact been committed, and he has reasonable ground for believing that the person to be arrested has committed it." Ill. Rev. Stat. 1961, chap. 38, par. 657.

Here the record shows that Captain Maher, one of the officers who took defendant into custody, had been the first officer to reach the scene of the crime only an hour before, and had found Hilbert Kampe, the owner of the tavern and assault victim, bloody and beaten, saying, "Bob, Bob, from across the street in the trailer court." Kampe's accusation or statement immediately upon being found by the police officer in a dazed and bloody condition gives rise to adequate grounds for Maher's believing that defendant was at least involved in the crime. The arrest was lawful in light of cases interpreting the statutory meaning of "reasonable grounds", and the constitutional meaning of "probable cause for arrest". *Draper* v. *United States,* 358 U.S. 307, 3 L. ed.2d 327, 79 S. Ct. 329; *People* v. *Fiorito,* 19 Ill.2d 246, 253; *People* v. *Jones,* 16 Ill.2d 569, 573-574.

Defendant next alleges denial of due process in that the entering of his trailer, without a warrant, by the police officers, subsequent to his arrest, and the taking of, first, his boots and later his jacket without his permission, constituted illegal searches and seizures in contravention of his rights under both the State and Federal constitutions. Defendant made a timely motion to suppress this evidence and a pretrial hearing thereon was held. After the hearing, the court denied the motion and at the trial, testimony was taken in regard to alleged blood stains found on the boots and jacket, and the articles themselves were admitted into evidence. At the pretrial hearing, the defendant, Captain Maher, and officer Boothe all testified in regard to the visits to the trailer. Their testimony established that

about an hour after defendant's arrest Maher sent officer Boothe back to the trailer to get a pair of boots which had been observed at the time of the arrest. About noon, Maher and Chief Perry again went to the trailer, and, in the presence of Mrs. Palmer and her father, took the jacket. In neither case had the officers obtained Palmer's consent to search his trailer home nor did they have a search warrant. However, it appears from the uncontroverted testimony of the officers that in both instances they were invited in by Mrs. Palmer after explaining why they were there, and that she freely consented to the searches and seizures. Moreover, it is clear from defendant's testimony, and the normal incidents of the marital relationship, that Mrs. Palmer had an equal right to the use and occupation of their trailer home. Therefore, the trial court properly denied the motion to suppress on the ground that where the premises are jointly owned or occupied by a husband and wife, the freely given consent of the wife to a search of the premises is sufficient to waive the husband's constitutional immunity. (*People* v. *Palmer,* 26 Ill.2d 464, 470; *People* v. *Speice,* 23 Ill.2d 40, 43; *People* v. *Perroni,* 14 Ill.2d 581; *People* v. *Shambley,* 4 Ill.2d 38, 42.) The boots and jacket thus obtained were properly admitted into evidence.

Defendant's argument that he was not accorded due process because he was denied the assistance of counsel and because of the quality of the defense afforded him by the public defender of Cook County is without substance. To bolster his argument, defendant isolates certain alleged errors from the record and then attacks the adequacy of the public defender system. The rule is well established that where a defendant contends that his representation by counsel was so incompetent as to deny him a fair trial as contemplated by provisions of the State and Federal constitutions, he must clearly establish actual incompetency of counsel and substantial prejudice resulting therefrom, without which the outcome would probably have been different.

(*People* v. *Coolidge*, 26 Ill.2d 533, 540; *People* v. *Cox*, 22 Ill.2d 534, 538; *People* v. *Morris*, 3 Ill.2d 437.) We find from an examination of the record that any alleged examples of incompetency are but the product of reflective hindsight or, at most, tactical errors, and that the defense conducted by the public defender was skillful, competent and without prejudicial error. In fact, the defendant himself acknowledges that the public defender's closing argument was "brilliant". Under the circumstances there is no justification for reversing defendant's conviction on the ground of incompetency of assigned counsel. *People* v. *Rogers*, 26 Ill.2d 599.

At the conclusion of the State's case, a defense motion for a directed verdict of not guilty was denied. Defendant now contends that such denial was improper because the State had failed to prove him guilty beyond a reasonable doubt. Defendant's oral motions for new trial and in arrest of judgment, made after judgment was entered on the verdict, were also denied. The statute under which the defendant was convicted provides that "Whoever willfully and maliciously and forcibly breaks and enters * * * any * * * building, with intent to commit murder, robbery, * * * or other felony or larceny" is guilty of burglary. (Ill. Rev. Stat. 1961, chap. 38, par. 84.) The indictment charged burglary and assault with intent to murder. The nature of the crime of burglary is such that its elements may be proved by circumstantial evidence and the inferences drawn therefrom. (*People* v. *Geisler*, 348 Ill. 510.) It was established that someone entered this closed and locked tavern building and assaulted Herman Kampe. In addition, Captain Maher testified that the southeast entrance to the tavern had been opened by forcible removal of a latch. The element of entry and manner thereof may be inferred from these and other facts in evidence. (*People* v. *Stanton*, 16 Ill.2d 459, 468.) Moreover, this court has recently held that: "* * * in the absence of inconsistent circum-

stances, proof of unlawful breaking and entry into a building which contains personal property that could be the subject of larceny gives rise to an inference that will sustain a conviction of burglary." (*People* v. *Johnson*, 28 Ill.2d 441, at 443.) Likewise, there was proof to sustain the charge of assault with intent to murder. The injurious result of the assault on Kampe for which he was hospitalized in critical condition was an uncontroverted fact. Kampe himself testified that his assailant, whom he recognized and identified as the defendant, said, "Now, I have to kill you.", and that he was then struck about the head with some hard object, apparently the hammer. The gist of the crime of assault with intent to murder is the specific intent to take life, and under the circumstances here present there was ample evidence from which this intent could be inferred. (*People* v. *Coolidge*, 26 Ill.2d 533, 536-538.) The identification of the defendant as the assailant was sufficiently established by Kampe's testimony. We find no error in the denial of defendant's motion for a directed verdict.

Defendant next contends that the State improperly admitted evidence of defendant's prior conviction. The allegedly objectionable testimony occurred when Captain Maher was relating the substance of the alleged oral confession made by the defendant. Maher testified, among other things, that defendant had said: "If I go up again it will be for life." A defense objection was properly overruled since the conversation was admissible to show defendant's motive in beating Kampe and stating he had to kill him. Cleary, Illinois Evidence sec. 12.9; McCormick on Evidence, sec. 157; *People* v. *Laures*, 289 Ill. 490.

At the trial, Captain Maher testified under both direct and cross examination that the defendant had orally confessed the crime while they were conversing alone in the lockup of the Oak Forest police station at about 10:00 P.M., on the evening of the arrest. No written confession was ever taken and both officers Maher and Perry and the de-

fendant testified that on several other occasions defendant declined to sign any statement of his guilt. Defendant now argues for the first time that the admission of his oral, uncorroborated confession was error, but fails to specify upon what basis he founds this contention other than to imply that it was involuntarily made. Ordinarily where a defendant fails to specify his grounds for an assertion upon review, we will not search the record or consider the contention. (*People* v. *Swets,* 24 Ill.2d 418, 424; *People* v. *Brendeland,* 10 Ill.2d 469, 472.) However, we have on occasions involving a possible denial of due process, looked to the record in such situations where the issue was not raised or reserved in the lower court. *People* v. *Burson,* 11 Ill.2d 360, 370.

There is nothing in the record or defendant's brief to indicate that he was ever subjected to physical or mental coercion, or deprived of the necessities of life. Therefore, his only ground for contending that the confession was involuntary must be that his detention was illegal. However, mere illegal detention in the absence of other coercive circumstances does not constitute a violation of due process in regard to confessions obtained during such detention, particularly where the accused is neither illiterate nor uninformed as to police practice, and has had previous criminal experience. (*People* v. *Price,* 24 Ill.2d 46; *People* v. *Miller,* 13 Ill.2d 84.) Moreover, illegal detention after a confession has been voluntarily given, will not relate back so as to render the confession inadmissible. *People* v. *Jackson,* 23 Ill.2d 274, 277; citing *United States* v. *Mitchell,* 322 U.S. 65, 88 L. ed. 1140, 64 S. Ct. 896.

Here defendant's alleged confession occurred after he had been in police custody about 14 hours during which time he was fed, given cigarettes, and was subjected only to intermittent questioning. Under established interpretations of due process, this confession, if made as testified to by the officers, was voluntary and, therefore, admissible.

*People* v. *Spencer*, 27 Ill.2d 320; *People* v. *Stacey*, 25 Ill.2d 258, 263; *People* v. *Jackson*, 23 Ill.2d 274; *People* v. *Miller*, 13 Ill.2d 84; *United States* v. *Ragen*, (7th cir.) 176 F.2d 579, 584-585.

Lastly, the defendant contends that several remarks contained in the State's closing argument created prejudicial error. In light of the defense argument and the quality and nature of the evidence produced at the trial this contention is without merit and the judgment will not be disturbed. *People* v. *Swets*, 24 Ill.2d 418, 423.

The judgment of the criminal court of Cook County is affirmed.

*Judgment affirmed.*