THE STATE OF OHIO, APPELLEE, *v.* McCARTHY, APPELLANT.

[Cite as State v. McCarthy, 20 Ohio App. 2d 275.]

(No. 29107—Decided December 4, 1969.)

*Mr. John T. Corrigan,* prosecuting attorney, and *Mr. William J. Coyne,* for appellee.

*Mr. James J. Carroll,* for appellant.

SILBERT, C. J. This is an appeal on questions of law from a judgment of the Common Pleas Court rendered upon a guilty verdict which was returned against defendant, appellant herein, on a charge of first degree murder. The defendant, Christopher F. McCarthy, on January 3, 1967, was charged with the murder of Max Fischer. Fischer had been killed in the living quarters behind his barbershop on the west side of Cleveland in the late afternoon of December 28, 1966.

Defendant urges seven assignments of error. We discuss only the second and third assignments, since we have carefully examined the other assignments of error urged by defense counsel and find none prejudicial to the substantial rights of the defendant, and they are, therefore, overruled.

Assignment of error number two reads as follows:

"The court erred in overruling the defendant's motion for the suppression of certain physical evidence and all testimony relating thereto, such evidence having been seized in the course of a warrantless search of his home in contravention of his rights under the Constitution of the United States and the Constitution of the state of Ohio."

Assignment of error number three reads as follows:

"The court erred in admitting into evidence the pellet which had been seized in appellant's basement, together with the testimony relating thereto, by reason of the fact that same could only be utilized by the jury as a basis upon which to predicate inference upon inference."

On November 22, 1967, there was a hearing on defendant's motion to suppress evidence seized at his home. The evidence shows that on December 30, 1966, Detective Murphey and Pawloski proceeded to defendant's home without a search warrant and proceeded to have the family car towed to the police station. In this car a box of .38 caliber shells was found. These shells were later introduced into evidence. At the time of this visit, the detectives were told that the automobile was listed under Mrs. McCarthy's name but that her husband used it. It was later stipulated at the

trial that the car was owned by Mrs. McCarthy but jointly used by her husband.

Before the first warrantless search, Mrs. McCarthy called her attorney, Mr. Thomas Shaughnessy, and subsequently she returned with a pen and paper with which to take notes of this search. At this point there was conflicting evidence why Mrs. McCarthy allowed her car to be towed away. Mrs. McCarthy claimed that an impending report was brought up by Detective Murphey. The following occurred on direct examination of Mrs. McCarthy:

"Q. What did he say regarding your pending case? A. He said, 'I understand you have a case pending before Judge McMahon in which you are awaiting a probation report.'

"Q. Did he say anything further? A. He said, 'If you will co-operate, it will help you.' "

This was specifically denied by Detective Murphey. He stated that the only reference to the pending probation report was made by Mrs. McCarthy, in which she blamed her husband for the charge.

On January 1, 1967, Mrs. McCarthy went to Central Police Station to retrieve her car. She met her attorney there. She, her attorney, and Detective Roberts conversed. There were conflicting views as to what transpired at this meeting. Mrs. McCarthy claimed Detective Roberts threatened her with a bad probation report because she was un-cooperative. However, both Detective Roberts and Mr. Shaughnessy denied that this discussion dealt with her probation status; rather, it dealt with the return of Mrs. McCarthy's car.

The evidence showed that on January 2, 1967, four detectives—Fischbach, Pawloski, Murphey and Kaminski —proceeded to the McCarthy house and removed a pellet from the basement wall. Detective Murphey testified that Mrs. McCarthy called her attorney before she allowed the police to search the basement. It was brought out that her attorney had been the person who had first brought her husband's name to the police as a suspect in the murder of Max Fischer. Also, Mr. Shaughnessy had a suit in court

to stay execution of a promissory note owed to Mr. Mc-Carthy. In addition, Mr. McCarthy had just pleaded guilty to a charge of assaulting Mr. Shaughnessy's wife.

After Mrs. McCarthy was advised by Mr. Shaughnessy that if she had nothing to hide she might as well cooperate, Mrs. McCarthy was extremely cooperative during this search. She warned the policemen that they might need flashlights; she showed them the area in which the pellet was lodged; she provided them with a wood chisel to extract the pellet; and she helped care for Detective Fischbach when he injured himself with the chisel.

Mrs. McCarthy claimed that Detective Murphey, at the time of this visit, stated that he would talk to Detective Roberts concerning her co-operation, Detective Murphey flatly denied this assertion.

In connection with that alleged statement of Detective Murphey, Mrs. McCarthy's response to a question propounded by the court is very interesting.

"The Court: When, on that particular day did he make this promise to you, that he would talk to Judge McMahon and assist you in getting probation?

"The Witness: On the way out of the door.

"The Court: This was after they made the search and were in the house originally?

"The Witness: Yes, sir, and after I told him how Detective Roberts treated me."

While Mrs. McCarthy indicated she thought Mr. McCarthy had had extra-marital relationships, she indicated that she still loved him. She was quite bitter about not receiving probation.

Weighing these factors, the court denied the motion to suppress the evidence with the followng remarks:

"I find that persons other than the defendant such as another occupant in the defendant's home may have given a valid consent to enter and search.

"Making this finding the court's next concern was whether or not the consent was voluntarily given.

"The court attempted to examine what we knew from the testimony; that the police went to the home of the defendant; there, they met the wife and had conversation with

her; that she called her lawyer and immediately upon her return, the evidence is crystal clear, she stated she would cooperate and tell the truth; * * * and it was testified to by the police officers at the second visit that she again called her lawyer, and the lawyer testified she called, and she did not recall in her testimony calling the lawyer but did not deny that she did not call him.

"* * * the court finds beyond a reasonable doubt that consent was voluntarily given and therefore the motion to suppress is herewith denied."

At the trial, the ballistics expert, Detective Roubal, asserted that this pellet was fired from the same gun that killed Max Fischer. The pellet was admitted into evidence.

The jury returned a verdict of guilty of murder in the first degree with a recommendation of mercy. Defendant was sentenced to the Ohio State Penitentiary according to law.

In response to assignment of error number two, we must examine the right of one spouse to be able to permit a warrantless search of the home in the absence of the other spouse. In considering this issue, it must be recognized that " 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and * * * 'do not presume acquiescence in the loss of fundamental rights.' " *Johnson* v. *Zerbst* (1938), 304 U. S. 458 at 464.

The earlier decisions, and perhaps still the majority, stress agency. In those cases, the efficacy of allowing the wife's consent to bind the husband in a warrantless search of the premises depends on whether she has express or implied authority to permit the search. This rationale was explained in *Humes* v. *Taber* (1850), 1 R. I. 464 at 473, where the court states:

"* * * Undoubtedly, the wife's authority extends to rendering the ordinary civilities of life. If she invite a neighbor, friend, or even a stranger, to enter the house in the way of hospitality, such invitation would, under ordinary circumstances, be a valid license so to do.

"But to imply an authority to the extent contended for

by the defendant in the present case, would be dangerous. An artful man might impose on the wife in the absence of the husband, and thus, for malicious and unlawful purposes, obtain from her a license to search the desk and private papers of her husband.''

This fear of an unwarranted invasion of one's property was heeded in many instances. In an era that frowned upon the rights of the married woman, it would have been unusual to permit the wife this wide latitude of opening her house to officers of the law in her husband's absence. See 31 A. L. R. 2d 1079 (1953).

The philosophy behind the agency approach is that the right to be free from unreasonable searches and seizures is in the nature of a personal right that cannot be waived by another person. Often courts avoided the issue of the wife's authority and based their conclusions on factual conclusions, such as hostility of the wife. 79 Corpus Juris Secundum 862 (1952); *People* v. *Lind* (1938), 370 Ill. 131, 18 N. E. 2d 189; *Kelley* v. *State* (1946), 184 Tenn. 143, 197 S. W. 2d 545. The United States Supreme Court avoided the issue in *Amos* v. *United States* (1921), 255 U. S. 313 at 317, stating, ''We need not consider whether it is possible for a wife, in the absence of her husband, thus to waive his constitutional rights, for it is perfectly clear that under the implied coercion here presented, no such waiver was intended or effected.'' Thus, the states were left to deal with this problem without guidance from the highest court in the land.

The Ohio Supreme Court, in *State* v. *Lindway* (1936), 131 Ohio St. 166, dealt with this problem in an obtuse manner. In that case, a series of night-time explosions had occurred, and the police believed the defendant was responsible. Three policemen went to the defendant's abode and, with the wife's permission, searched without a warrant. The court stated at 171:

''Since the constitutional barrier to unreasonable searches and seizures is in the nature of a personal privilege, it is questionable if it may be waived by anyone except the person whose rights are invaded. A conflict of au-

thority exists as to whether any such waiver may be made by the wife of the one who is involved, in his absence, with the weight of authority against it. * * *''

The court found that, even if one assumes that the wife has such implied agency, her assent was not spontaneous and was coerced. *However, the evidence was still allowed at the trial*, because the Fourth Amendment did not apply to the states at this time. Therefore, the importance of that decision has diminished considerably with the decision of *Mapp* v. *Ohio* (1961), 367 U. S. 643, applying the protections of the Fourth Amendment to the states. Thus, the remarks concerning the wife's ability to permit a search are not on point and should not be regarded as binding Ohio to the agency view.

While the law in Ohio lay dormant, a host of decisions was decided in various states permitting the wife the right to allow a search. These cases rest on concepts such as joint ownership, in joint occupancy or joint control. *State* v. *Cairo* (1948), 74 R. I. 377, 60 A. 2d 841, illustrates this new stance of the courts. The court, after rejecting *Humes* v. *Taber*, 1 R. I. 464, states, at 388:

''* * * As we have indicated earlier in this opinion, the wife as such joint tenant, co-owner and occupant had ample authority in her own right to permit entry by the officers and a search by them. If as such joint tenant, co-owner and occupant she had not been related to either defendant, no question as to her right would arise. In our opinion her mere relationship to one defendant as his wife would not as a matter of law destroy that right which was personal to her. * * *''

This emphasis on the right of the wife rather than the husband is followed in most of the recent cases. See *Wade* v. *Warden, Md. Penitentiary* (D. C. Md., 1968), 278 F. Supp. 904; *Bellam* v. *State* (1964), 233 Md. 368, 196 A. 2d 891; *People* v. *Palmer* (1964), 31 Ill. 2d 58, 198 N. E. 2d 839.

It is interesting to note that Hawaii, when grappling with this problem for the first time, rejected the agency theory and stated that joint control is the key. In *State* v.

*Evans* (1962), 45 Haw. 622, 372 P. 2d 365, the court accepted joint control but still deemed the search unreasonable because the wife permitted the police not only to search the common areas of the house but the defendant's bedroom drawers. This distinction between search of the common areas and personal effects does not run afoul of the joint-occupancy theory.

This recognition of the sanctity of personal effects was noted in *Roberts* v. *United States* (C. C. A. 8, 1964), 332 F. 2d 892, a case with many attributes similar to our own. There, a bullet had been fired into the ceiling. Mrs. Roberts provided the police with a pair of wire pliers to secure the bullet. The F. B. I. was able to secure this bullet with her help. The federal Court of Appeals sustained the search on the basis of the wife's right to control ingress and egress. The court listed five factors which play a role in the decision of a court in this area. They are: voluntariness of consent, place of search, control of premises, nonpersonal property seized, and reasonableness of the search. The court found that a bullet fired into a ceiling was not a personal effect and, therefore, the search was valid.

A very recent Ohio case, *State* v. *Wigglesworth* (1969), 18 Ohio St. 2d 171, indicates that Ohio is following the emerging trend of joint occupancy. There, the defendant was convicted of the first degree murder of his wife. The court states in paragraph two of the syllabus:

"Where a married man lives with a woman, other than his wife, in her apartment off and on for about six months and for two weeks before a search of that apartment by law enforcement officials and leaves some of his clothes in that apartment, a search of her apartment with her consent and in his absence does not violate any constitutional rights of such man."

Implicit in that statement is the concept that defendant in living with this woman has assumed the risk that she will permit a search. Joint occupancy gives the woman the right to allow this search.

This new Ohio view was bolstered in *Frazier* v. *Cupp*

(1969), 394 U. S. 731. There, the petitioner used a duffel bag jointly with his cousin. The police went to arrest the cousin in connection with the crime, and he consented to a search of the duffel bag. Clothing of the petitioner was permitted to be shown at trial. The court stated:

"* * * Petitioner argues that Rawls only had actual permission to use one compartment of the bag and that he has no authority to consent to a search of the other compartments. We will not, however, engage in such metaphysical subtleties in judging the efficacy of Rawls' consent. Petitioner, in allowing Rawls to use the bag and in leaving it in his house, must be taken to have assumed the risk that Rawls would allow someone else to look inside. We find no valid search and seizure claim in this case."

The proposition, that, in sharing property with someone, there is in effect an assumption of risk that the co-occupant may or may not permit a search of this property, has received approval from the highest court of the land. The courts of this country are becoming increasingly aware of the rights of the co-occupant rather than the defendant. The emphasis on agency is dissipating, and joint control is now being focused upon.

In our case, the search of the car can be disposed of easily. Since the car was in Mrs. McCarthy's name, and she had the right to control its movement, her permission in allowing the search was valid. See *Gurleski* v. *United States* (C. C. A. 1968), 405 F. 2d 253, and *State* v. *Coolidge* (1965), 106 N. H. 186, 208 A. 2d 322.

The more perplexing problem concerns the search of the McCarthy house on January 2 without a search warrant. Christopher McCarthy was already in custody at this time, and his permission had not been secured. It was not necessary that the officers have a warrant. "The test of the constitutionality of a search is not the practicability of procuring a search warrant, but the reasonableness of the search itself." *State* v. *Twitty* (1969), 18 Ohio App. 2d 15.

On the basis of *Wigglesworth* and *Frazier*, Ohio should

follow the joint-control rationale. Mrs. McCarthy had as equal a right to her home as did her husband. She should be allowed to admit whomsoever she chooses to the common areas of the house. There is credence to the concept that the search should not include personal effects of the defendant. Often the rights of individuals commingle, making it impossible to distinguish where one's rights end and another's begin. With the emphasis on the wife's rights rather than her defendant-husband's, the rights of the husband have not disappeared but merely diminished in stature. To allow a search of his personal effects would unduly destroy the husband's rights against unreasonable searches.

The pellet removed from the McCarthy house was not a personal effect. It was capable of being observed by anyone. As the court said in *Roberts* v. *United States*, 332 F. 2d 892, at page 898:

"* * * Black's Law Dictionary (4 ed. 1951) defines personal effects as: 'Articles *associated with person*, as property having more or less *intimate relation to person* of possessor * * *.' (Emphasis supplied.) By no stretch of the imagination can it be held that a bullet fired into a ceiling approximately a year before is 'associated with person' or has an 'intimate relation to' the person of the firer of the weapon. * * *"

*Frazier* is applicable in this situation. Mr. McCarthy, like the defendant in *Frazier*, must assume the risk that his wife or co-occupier of the property seized would permit a search.

It having been established that Mrs. McCarthy did have the right to allow a search and seizure of the pellet, the element of coercion must be considered. If she was coerced, either openly or impliedly, the search must fail. The appellate court will accept the finding of the trial court unless it is clearly erroneous. This occurs because the trial court is best able to gauge the credibility of witnesses. In our situation, the burden is on the state to prove that consent was freely and intelligently given. *State* v. *Aull* (1967), 78 N. M. 607, 435 P. 2d 437; *Naples* v. *Max-*

*well* (S. D. Ohio, 1967), 271 F. Supp. 850; *Dalton* v. *State* (1952), 230 Ind. 626, 105 N. E. 2d 509.

There was no implied coercion present in the circumstances of this case. Mrs. McCarthy had the advice of her attorney before she allowed the basement to be searched. While the pending probation report was on her mind, the evidence indicates that the detectives did not use the possibility of probation as a hidden instrument to club her mind into acquiescence. The denial by both Mr. Shaughnessy and Detective Roberts that probation was discussed at the January 1st meeting, and Mrs. McCarthy's statement that she did not bring up the subject of probation until after the search on January 2, 1967, weigh heavily as factors in favoring the search.

The biased attitude of Mrs. McCarthy's lawyer, Mr. Shaughnessy, does not invalidate her consent. He did not coerce Mrs. McCarthy. She was aware of her attorney's dislike of her husband and his efforts to pin the murder on her husband. She allowed the search acting in her own best interests. The knowledge that she was angry at her husband both for her pending charge of forgery and his suspected extra-marital activities must be tempered with the thought that she still loved her husband. There was no evidence that she was out to "get her husband."

Mrs. McCarthy had the ability to permit the search and she exercised it without undue pressure. Her fear of her future was natural, but the evidence indicates that the police did not use this fear to procure entry or search of the premises. She was extremely cooperative. The consultation with her attorney before each search indicates that she was not pressured or forced into submission by the officers. The finding of the lower court was clearly reasonable and should be sustained.

Assignment of error number three is without merit and is, therefore, overruled. An inference is a permissible deduction which the jury may make from a set of facts that can be deduced by the ordinary principles of logic. It is settled that an inference based on another inference cannot be used to convict a person. However, it is quite rea-

sonable for two inferences to be based on the same set of facts. In *McDougall* v. *Glenn Cartage Co.* (1959), 169 Ohio Ohio St. 522, the court succinctly stated the applicable rule:

" 'The only inferences of fact which the law recognizes are immediate inferences from the facts proved. * * * But a given state of facts proven to the satisfaction of the jury may give rise to two or even more separate inferences, and in such a case one inference is not built upon the other, each is drawn independently from the same evidence. ' "

There was enough evidence to infer that the bullet removed from Max Fischer's body was fired from the same gun as was the pellet removed from the McCarthy wall. Several witnesses' testimony placed Mr. McCarthy and his car near the scene of the murder. The jury's consideration of this pellet goes beyond mere speculation into the realm of probability. The discussion of the pellets was relevant to the question at hand. Any inferences that the jury made were based on facts, not inferences. See *State* v. *Smith* (1966), 8 Ohio Misc. 148; *State* v. *Chamberlain* (1963), 94 Ohio Law Abs. 221; *Price* v. *Cox* (1957), 104 Ohio App. 251; *Hurt* v. *Charles J. Rogers Transportation Co.* (1955), 164 Ohio St. 329.

Thus, both assignments of error are overruled, and the judgment of the Court of Common Pleas is affirmed.

*Judgment affirmed.*

WHITE, J., concurs.

DAY, J., dissenting. I dissent. I would reverse and remand for a new trial.

The basis of dissent is the denial of the motion to suppress the allegedly corroborating evidence obtained when the defendant's estranged wife permitted the police to search their home without a warrant while he was away. Apparently the underlying basis for denying the motion was the wife's consent. The question of consent is compli-

cated "slightly" by the fact that the wife of the defendant in this case suspected him of extensive extra-marital adventures and blamed him for her involvement in a criminal charge to which she had pleaded guilty and was awaiting sentence. She testified she was not unaware of the possible relation of her co-operation with the police to her chances for probation. Obviously these are conditions not necessarily supporting an inference that she was sensitive to her husband's interest,[1] and a finding of consent in such circumstances may be "unfounded in reason." Cf. *Herter* v. *United States* (C. C. A. 9, 1928), 27 F. 2d 521. With that bit of litotes out of the way, it is appropriate to turn to the applicable law.

First, the waiver of constitutional rights is not favor-

------

[1]There are several other factors reflected in the record which have a direct bearing on the voluntary aspect of the consent. For example, the wife testified that her attorney advised cooperation with the police. His objectivity, pertinent here only on the issue of the effect of his advice on the wife's "consential" action, is subject to reservations. At the time the advice was given, the defendant in this case was serving time in the workhouse for having beaten the lawyer's wife and was the defendant in two civil suits filed by the lawyer—one for damages for the assault and battery and one to restrain collection on a note written by the lawyer in the defendant's favor for $2,500. The lawyer also worked part-time as a reporter for a suburban newspaper. As a journalist he chronicled under his own by-line his part in turning in the defendant. The majority notes her protestation of continuing love for the defendant and, therefore, must be deemed to draw comfort from the protest for a conclusion of untainted voluntary wifely consent. With deference, I suggest that if her actions in this case manifest both *knowledge* and love, her hate could be catastrophic. See *Kelley* v. *State* (1946), 184 Tenn. 143, 146, 197 S. W. 2d 545, 546, where the right of an *angry* wife "to waive her husband's protection against unreasonable searches and seizures * * *" was denied.

*People* v. *Carter* (1957), 48 Cal. 2d 737, 746, 312 P. 2d 665, 670, conditioned its approval of spousal waiver upon "the usual amicable relations * * * between husband and wife." *State* v. *Evans* (1962), 45 Haw. 622, 633, 372 P. 2d 365, cited by the majority, leaned heavily on *Carter* in concluding in a dictum that spousal waiver was permissible while declining to sanction a wife-approved search of the husband's personal effects. However, none of these complications need be weighed if the wife was not qualified to consent for her husband as a matter of law.

ed. Indeed, we must indulge every reasonable presumption against it, and the intelligence of the waiver in each case depends upon the particular facts and circumstances "surrounding that case." Cf. *Johnson* v. *Zerbst* (1938), 304 U. S. 458, 464. And, where a warrantless search is claimed to be redeemed by consent or waiver, the burden of proof by clear and positive evidence has been held to be on the proponent. *Judd* v. *United States* (1951), 190 F. 2d 649, 651.

Second, while consent is one method for waiving the right against searches and seizures otherwise proscribed by the Fourth and Fourteenth Amendments to the United States Constitution, more than mere consent is involved in the instant case. For the question here is one of consent by agency. In fine, the query is whether a wife, in the absence of express authority, is qualified to consent to a search of the home to be carried out in pursuit of evidence against her husband, thus waiving his right for him. Stated another way, the question is whether the waiver of the husband's constitutional rights is personal to him. On the personal nature of such waiver, cf. *Henry* v. *Mississippi* (1965), 379 U. S. 443, 446, where the court remanded for a hearing on the question whether a defendant represented by counsel had "knowingly waived decision of his federal claim" when his lawyer failed to make timely objection to illegally seized evidence.

The Supreme Court of Ohio has never passed on this question in its pristine form. However, in a case whose thrust on the point was slowed by other considerations.[2] the court said:

"Since the constitutional barrier to unreasonable searches and seizures is in the nature *of a personal privilege*, it is questionable if it may be waived *by anyone* except the person *whose rights are invaded. * * *.*" (Emphasis added.) (*State* v. *Lindway* [1936], 131 Ohio St. 166, 171.)[3]

---

[2]That is, whether the wife's assent lacked the spontaneity of an invitation when, "unexpectedly faced by the coercive influence of three law officers," she allowed the search. *State* v. *Lindway, infra*, at 171.

[3]Reversed *sub silentio* on the issue of the exclusion of illegally seized evidence by *Mapp* v. *Ohio* (1961), 367 U. S. 643.

The Supreme Court of Ohio went on to note that the weight of authority is against waiver made by a wife in her husband's absence. *Id.* at 171.[4] See also, *United States* v. *Rykowski* (D. C., S. D., Ohio, 1920), 267 F. 866, 871; *State* v. *Hall* (1965), 264 N. C. 559, 563, 142 S. E. 2d 177; *State* v. *Wilkerson* (1942), 349 Mo. 205, 212, 159 S. W. 2d 794, 799; *Maupin* v. *State* (1927), 38 Okla. Cr. 241, 242, 260 P. 92, 92-93; *Dalton* v. *State* (1952), 230 Ind. 626, 631, 105 N. E. 2d 509, 511-512; and cf. *Henry* v. *Mississippi* (1963), 154 So. 2d 289, 296 (Advance Sheet).[5]

Obviously, the rule to which the Supreme Court of Ohio ascribes the weight of authority is more consistent with the presumption against waivers announced in *Johnson* v. *Zerbst* (1938), 304 U. S. 458, than is the opposing view allowing vicarious spousal consent.

The Supreme Court of the United States has not ruled on the question whether a wife may waive a husband's right against a warrantless search. The issue was presented in *Amos* v. *United States* (1921), 255 U. S. 313, 317, but a resolution of the question was unnecessary to decision. In that case a demand by government officers to search the defendant's store and house without a warrant was held sufficient to present a case of implied coercion and to negate waiver. What the *Amos* court would have done on the facts in the present case is a matter of conjecture. It is well established, however, that the law does not glad-

---

[4] Ohio has never altered its stance on this question. *State* v. *Wigglesworth* (1969), 18 Ohio St. 2d 171, 174-175, involved consent by the sole lessee of the apartment where the search took place. The consenting female (lessee) was, at very best, *not* the complaining defendant's wife.

[5] The Supreme Court of Mississippi held that a wife's consent to a search of her husband's car did not waive his constitutional rights. The opinion was later withdrawn and a different opinion filed by the Supreme Court of Mississippi after the state filed a Suggestion of Error on procedural grounds. The later opinion is reported in bound volumes of Southern 2d with the same volume and page number—154 So. 2d 289 (1963). The Supreme Court of the United States remanded on grounds unrelated to the wife's consent but in its opinion described the events related in this footnote. *Henry* v. *Mississippi* (1965), 379 U. S. 443, 444-446.

ly suffer the waiver of constitutional rights. See *John-son* v. *Zerbst* (1938), 304 U. S. 458.

The presence of advising counsel does not save the situation. The lawyer was not the defendant's lawyer. The consequences for the defendant in this case obviously were not the lawyer's concern. Moreover, the record shows the advice he gave defendant's wife was clearly designed to elicit conduct on her part to protect her interests not her husband's. Indeed, the record reflects such occasion for personal bitterness between the wife's counsel and the defendant that it is permissible to wonder whether it would not have been better for him to disqualify himself from advice to her on matters touching the husband's interest.

With deference, I suggest that *Johnson* v. *Zerbst* (1938), 304 U. S. 458, provides firmer ground for a projection of what the Supreme Court of the United States might hold on the question of vicarious consent to search than does *Frazier* v. *Cupp* (1969), 394 U. S. 731, on which the majority places some reliance. In the *Cupp case*, the court made short shrift of a defendant's contention that the trial court erred in permitting the yield of a search of a duffel bag stored with the defendant's cousin to be admitted into evidence. The court said that as a joint user the cousin had clear authority to consent to the search.

However, in defining a proper application of the probable cause standards necessary to justify a search without a warrant,[6] the cases have long observed a distinction between movable objects, see *Brinegar* v. *United States* (1949), 338 U. S. 160; and *Carroll* v. *United States* (1925), 267 U. S. 132,[7] and homes with their special claims to privacy, cf. *McDonald* v. *United States* (1948), 335 U. S. 451 (defendant's room in a rooming house); *Johnson* v. *United*

---

[6]For the general proposition that searches *with* warrants enjoy preferred status, see *United States* v. *Ventresca* (1965), 380 U. S. 102, 105-107. The reverse implication is obvious.

[7]It is significant that in *Brinegar*, 338 U. S. at page 176, this language appears:

"* * * No problem of searching the home or any other place of privacy was presented either in *Carroll* or here. Both cases involve freedom to use public highways in swiftly moving vehicles * * *."

*States* (1948), 333 U. S. 10, 12-15 (hotel room-living quarters of the defendant) ; *Chapman* v. *United States* (1961), 365 U. S. 610 (rented house).⁸ Cf. *Camara* v. *Municipal Court* (1967), 387 U. S. 523, 532-533 (warrantless inspection of private home by building inspector prohibited) ; and *See* v. *Seattle* (1967), 387 U. S. 541, 542-543, 545-546 (warrantless inspection of commercial warehouse by fire department prohibited). In the *See case* the court said of its decision in *Camara* v. *Municipal Court*:

"* * * As we explained in *Camara*, a search of private houses is presumptively unreasonable if conducted without a warrant. * * *"

By analogy, because a home is involved here, there is an obvious reason for requiring a stronger proof of waiver than in the case of a movable object with the debased privacy of a duffel bag.

However, it is unnecessary to rely upon the analogy. The day the policy of the law expresses as much concern for the preservation of cousinly rapport as it does for the conjugal relation, equates the privacy of a duffel bag with the privacy of a home, and holds that constitutional rights are no longer personal, will be time enough for finding that the *Frazier case* is dispositive of the issues here. I am not prepared to assume that the Supreme Court of the United States has gone so far in the absence of a specific holding.

In connection with another aspect of the search and seizure problem, Judge Learned Hand once remarked that it was:

---

⁸In *Chapman* v. *United States* (1961), 365 U. S. 610, at 613, the admission of the yield of a search of petitioner's house, with his landlord's consent but without a warrant, required a reversal. The Court said: "Until *Agnello* v. *United States*, 269 U. S. 20, this court had never directly decided, but had always assumed, 'that one's house cannot lawfully be searched without a search warrant, except as an incident to a lawful arrest therein' (*id.*, at 32), but that case explicitly decided that 'Belief, however well founded, that an article sought is concealed in a dwelling house furnishes no justification for a search of that place without a warrant. And such searches are * * * unlawful notwithstanding facts unquestionably showing probable cause.' *Id.*, at 33."

"* * * small consolation to know that one's papers are safe only so long as one is not at home. * * *" *United States* v. *Kirschenblatt* (C. C. A. 2, 1926), 16 F. 2d 202, 203.[9]

It is comparable consolation to the defendant in this case to know that his right to be protected against unconstitutional searches is safe only when his angry wife is not at home.

Angry or not, no spouse should be held vicar for the other in the important matter of the waiver of the constitutional right against a warrantless search of the home unless there is a specific, intelligent, intentional grant of authority to perform such agency.[10]

---

[9]Judge Hand was evaluating a general search incidental to an arrest at home by comparing it to an unconstitutional search under a general warrant. In his view the latter had an advantage for the citizen over the search incidental to arrest because the warrant, though general, presumably had a magistrate's scrutiny before issuance.

[10]The majority buttresses its contrary conclusion with the fact that female emancipation is relatively recent and also with the logic of *State* v. *Cairo* (1948), 74 R. I. 377, 60 A. 2d 841. There is nothing about the emancipation of women that makes one spouse custodian of the constitutional rights of the other. The specious quality of the logic in the *Cairo case* is apparent from the quotation repeated in the majority opinion. The court in that case said that if the wife were not "related to either defendant, no question as to her right would arise. In our opinion her *mere relationship* to one defendant as his wife would not * * * destroy that right which was personal to her." (Emphasis supplied.) This delineation ignores the fact that, among other things, that "*mere relationship*" of husband and wife posits a testimonial immunity and a joint right in the home which are, in effect, weakened or destroyed if the wife may waive the husband's *personal* constitutional protection.