The People of the State of Illinois, Plaintiff-Appellee, *v.* Ernest Davis, Defendant-Appellant.

(No. 11490;

Fourth District—July 18, 1972.

John F. McNichols, of Defender Project, of Springfield, (Bruce L. Herr, of counsel,) for appellant.

Lawrence E. Johnson, State's Attorney, of Urbana, (William R. Gaston, Assistant State's Attorney, and L. Keith Hays, Jr., Senior Law Student, of counsel,) for the People.

Mr. JUSTICE SIMKINS delivered the opinion of the court:

Appellant-Defendant Ernest Davis was tried before a jury and convicted of armed robbery of Joe Manzella, Sr., of attempt murder of the same individual, and of attempt murder of Frank Manzella. The defendant was sentenced to indeterminate terms of 5 to 15 years of each conviction, the sentences to run concurrently.

Joe Manzella, Sr., Frank Manzella, his son, and Tony Ligga, own and

operate Patio Number One, a restaurant in Champaign, Illinois, which was the scene of the occurrence in question.

On January 11, 1970, at about 1:55 A.M., the defendant came into the restaurant, ordered a beef sandwich "to go" which was prepared and delivered to him in a paper sack. Defendant then went to the cash register where Joe Manzella was working, pulled a revolver and demanded that Joe put money in the sack which contained the sandwich. Joe did so, a scuffle ensued and the defendant fired two shots, one of which struck Joe Manzella in the hand and the other struck Frank Manzella in the stomach. There were many patrons in the restaurant and a scene of considerable confusion attended these events. People were running, there was shooting, the defendant succeeded in getting through a door which led from the restaurant into a vestibule while carrying the sack containing the money. The outer door which opens from the vestibule to the outside of the restaurant opens in a different fashion than the inner door which leads to the vestibule. At this point the defendant became confused, was unable to open the outer door, dropped the sack containing the money and broke the glass in the outer door and thus exited from the premises. When the police arrived many persons had seized the defendant, had thrown him to the sidewalk in front of the restaurant and were beating him.

■■ Defendant argues that the evidence was sufficient to support a verdict of attempt armed robbery and that his tendered instruction should therefore have been given. An analysis of the evidence, however, discloses that he relies upon what may be termed negative testimony. Some witnesses observed the entire transaction, others observed only parts of it, but the positive, affirmative testimony of several witnesses clearly establishes that the defendant demanded, at the point of a gun, that Joe Manzella deliver money to him, that money was placed in the paper sack and that the paper sack was later found, together with the money in the vestibule, and that several witnesses observed the defendant carrying the sack which contained the money. Defendant concedes that there is sufficient evidence of armed robbery to support the jury's verdict. The trial court was correct in refusing to instruct on attempted armed robbery. That the defendant took money from the person and presence of Joe Manzella, Sr., is established beyond any reasonable doubt, and there is no evidence in this record upon which the jury would have been justified in concluding that the defendant had only attempted to commit armed robbery.

The defendant states his next contention of error as follows: "The trial court committed prejudicial error when it instructed the jury, over defendant's objection, that the felony—murder concept is included in the

definition of murder applicable to attempt murder". We first note that two counts of the indictment which invoked the felony murder rule were dismissed, prior to trial, by the Court on defendant's motion. These counts charged, in essence, that the defendant committed the offense of attempt in that he did, with intent to commit the offense of armed robbery, shoot Frank Manzella and Joe Manzella, which acts constituted a substantial step toward the commission of the offense of murder. These two counts were obviously calculated to apply the felony murder concept as contained in Ch. 38, Sec. 8—4, Ill. Rev. Stats., 1967. Defendant was then tried upon each of three counts remaining in the indictment. One of these counts charged armed robbery of Joe Manzella; another charged that defendant committed the offense of attempt * * * in that he did knowingly and with intent to commit the offense of murder, did shoot one Frank Manzella * * *, which act constituted a substantial step toward the commission of the offense of murder * * *." The third count upon which defendant was tried charged the offense of attempt murder of Joe Manzella and with the exception of the change of names reads precisely as the count charging attempt murder of Frank Manzella.

To place the respective arguments of counsel in context we note that the following instructions were given:

"A person commits the crime of murder who kills an individual if, in performing the acts which cause the death, he intends to kill or do great bodily harm to that individual; or he knows that such acts will cause death to that individual; or he knows that such acts create a strong probability of death or great bodily harm to that individual; or he is attempting to commit or is committing the crime of Armed Robbery.

A person commits the crime of attempt who, *with intent to commit the crime of Murder,* does any act which constitutes a substantial step toward the commission of the crime of murder.

The crime attempted need not have been committed.

To sustain the charge of Attempt, the State must prove the following propositions:

That the defendant performed an act which constituted a substantial step toward the commission of the crime of Murder; and

That the defendant did so *with intent to commit the crime of Murder;* and

That the defendant was then capable of acting intentionally.

If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty."

■ In essence, defendant argues that since the definition of murder given to the jury included the language "* * * or he is attempting to commit or is committing the crime of armed robbery" the jury would have been warranted in believing, that if they found that Davis had an intent to commit armed robbery and took any substantial step toward committing the armed robbery they could find him guilty of attempt murder, absent a finding of specific intent to kill contrary to the rule that an essential element of attempt murder is the specific intent to kill. In *People v. Palmer*, 31 Ill.2d 58, 198 N.E.2d 839, the Supreme Court held that the gist of the crime of assault with intent to kill is the specific intent to take life. While *Palmer* was decided on the law as it existed prior to the codification of the felony—murder rule and the enactment of the attempt provisions of the Criminal Code (Ch. 38, Sec. 8—4, Ill. Rev. Stats., 1969), there is nothing to indicate that the legislature intended, by these enactments, to abrogate the rule enunciated in *Palmer* and we agree that conviction of attempt murder must be predicated upon specific intent to kill.

■■ The definition of murder as given to the jury was in the words of the statute except that the words "armed robbery" were substituted for the language "* * * forcible felony other than voluntary man-slaughter." It was incumbent on the court to define the offense of murder in connection with the attempt charges. (*People v. Koshiol*, 45 Ill.2d 573, 262 N.E.2d 446), and the inclusion of the language objected to did not, in our view, instruct the jury to find defendant guilty of attempt murder if it found that Davis shot the Manzellas while committing an armed robbery and while intending to commit armed robbery.

■■ Instructions must be read as a whole. In each of the two counts which charged attempt murder it was specifically alleged that defendant shot each of the Manzellas "knowingly and with the intent to commit the offense of murder * * *" and as noted above, the jury was charged that in the case before it attempt was defined as applicable to one who "* * * with intent to commit the crime of murder * * *" did any act which constituted a substantial step toward the commission of that crime. They were also instructed that to sustain the charge of attempt the People had to establish that the defendant had performed an act which constituted a substantial step toward the commission of the crime of murder and "that the defendant did so with intent to commit the crime of murder." Additionally, the jury was properly instructed as to the elements which comprise the offense of armed robbery and thus

advised that no intent was required to be established in connection with that offense.

Both of the Manzellas survived the shooting and while it would have been preferable to omit the felony murder language from the instruction defining murder, we find no reversible error in the inclusion. The jury could not have been misled because of the clear directives contained in the three instructions which explicitly directed them that in order to convict they must find that defendant, in shooting the Manzellas, had the specific intent to commit murder.

■■ We disagree with the contention of the People which is, in effect, that since the attempt section of the Code (Sec. 8—4, *supra*) provides that a person is guilty of attempt when "* * * with intent to commit a specific offense * * *", he does an act which constitutes a substantial step towards its commission, the felony—murder rule is made applicable to attempt murder. To adopt this argument and construction of the attempt statute and the felony—murder rule, would place the offense of attempt murder in this precise posture: If A intends to commit armed robbery and during the commission of the crime shoots B, A may be convicted of the crime of attempt murder. This result, would, of course, obviate the necessity of proving specific intent to kill which, as indicated above, we hold to be an essential element of the crime of attempt murder under the persuasion of *Palmer, supra,* and for these reasons disagree with the position of the People on the issue.

■■ Defendant predicated his defense to the charges of attempt murder on the premise that his voluntarily induced intoxication and drugged condition rendered him incapable of forming the specific intent which is an essential element of the offense. A person who is in an intoxicated or drugged condition is criminally responsible for his conduct unless his intoxication or drugged condition negatives the existence of a mental state which is an element of the offense, ch. 38, sec. 6—3 (a), Ill. Rev. Stat. 1971. The statute applies the same standard to a drugged condition as it does to a state of intoxication. (*People v. Wicker,* 4 Ill. App. 3d 990, 282 N.E.2d 771, 775.) Defendant urges that the trial court erred in excluding evidence which was offered to prove that he was in a drugged condition and thus unable to form the specific intent to kill Joe Manzella, Sr., or Frank Manzella.

The evidence introduced by defendant on the issue of his purported intoxication and drugged condition was as follows: Robert Samuel Davis, unrelated to defendant, first saw defendant at approximately 9:00 P.M., on January 10, 1970, in the Monarch Tavern. Defendant appeared to have been drinking. The witness and defendant then went to the University Elks, a night club where they remained until 12:30 A.M., on

January 11th. Defendant drank beer and about 12:30 asked the witness if he wanted "*  *  * to get high". Defendant had some pills. The witness refused. Two of the pills were red. Davis swallowed the two red pills and two other pills the appearance of which the witness could not recall. Davis drank beer in swallowing the four pills. Shortly thereafter defendant began getting quiet and his speech was slurred. The witness had previously seen pills like those defendant swallowed and testified that "Some people call them reds. Some call them red devils". He also testified that he had no firsthand knowledge of "*  *  * what those pills were" only that he had seen them before.

The witness, Lawrence Williams, a student at the University of Illinois, testified that "he had known defendant for 22 years. On January 10th he was with Davis from 11:30 A.M., until 4:30 P.M., during which time defendant consumed three-quarters of a fifth of wine and four or five beers and that he took two pills "*  *  * which are known as reds". Williams had on one occasion taken two reds. Williams saw defendant again for about an hour on January 10th, at six or seven o'clock P.M., in Al's Tavern. Defendant consumed beer and mixed drinks. Williams saw the defendant a third time at the Elks club and was with him there from 10:00 P.M., until the Club closed at 1:00 A.M., on the morning of January 11th. Defendant drank a couple of Tom Collins and more beer. At 12:15 or 12:30, defendant showed the witness two pills called "Christmas Trees" and two pills called "Reds". He noticed that defendant, at about 12:15, was in a "nod". Then he tried to talk to defendant who failed to respond and then described a "nod" as follows: "A nod is something which people who are high off of narcotics for one, heroin is one which after, you know, inject it, like as far as having any mental thing, as far as being able to think clearly, well you can't do it. Like the guy he don't be asleep but, he's just standing up, just rocking." In Williams' opinion, the defendant was "high on the alcohol and drugs that he had consumed". Williams also testified that he had seen defendant on other occasions when he was intoxicated, but that his appearance and condition at this time were different than on other occasions because this time he was unable to communicate with defendant.

■■ The witness, James Culp, a bartender at the Sportsmen's Club testified that he had known defendant for many years. That defendant came into the Sportsmen's Club on the morning of January 11th, at about 1:00 A.M. Culp then testified that in his opinion the defendant was extremely high "*  *  * and I don't think it was off alcohol, because being a bartender I can tell the difference—there is a difference in peoples' reactions in being high off of other things". On objection the

Court struck the answer, except that portion which stated that the defendant was extremely high. This ruling was correct. There was no foundation elicited which warranted admission of Culp's opinion that defendant was high on something other than alcohol. Culp testified that he had seen defendant in an intoxicated condition on previous occasions, but when asked to compare defendant's appearance and actions on the night in question with his appearance and actions when intoxicated on previous occasions, the trial judge sustained an objection.

Defendant Davis testified to drinking with Williams and that he had some pills in his pocket which were known to him as "Christmas Trees" and "red devils" or "reds". That "the Christmas Trees are green, three colors. A bright red, and there's a red that's not quite as bright as the other one. The red or red devils are red all over. I consumed all of them during the course of the day. What I had were capsules and not pills". Defendant also testified that prior to January 10th he had taken both Christmas Trees and red devils and stated that their effect on him was that he had no sense of time, that he became drowsy and drugged. That he had nine of the capsules with him on the morning of January 10th and did not recall giving any of the capsules to anyone else.

At this juncture the Court observed that there was no evidence as to what the capsules contained. The jury was sent out and defendant's counsel stated to the Court that he hoped to be able to establish that the capsules in question contained barbiturates. Still outside the presence of the jury the defendant made an offer of proof as to what defendant's further testimony would be on the issue of the capsules in question. The defendant was handed Defendant's Exhibit Two for identification which is a 24 page booklet entitled "300 Most Abused Drugs". Defendant testified that on page 20 was the picture of a capsule, known to him as a Christmas Tree, because of its shape, color and size. That the picture of the capsule was identical to the capsules which he had consumed. That he had secured the capsules from a student whom he knew only by sight. That he had secured capsules of the same kind several times during the past year from the same individual. That the capsules he had consumed on January 10th and 11th were the same as depicted on page 20 of the booklet. That he had had a conference with a Doctor Heifetz on the day preceding the testimony and the doctor had used the booklet during the conference.

The trial was then resumed before the jury and the Court ruled "The jury will disregard at this time any testimony about pills. The liquor testimony will stand, but the pills, the objections have been sustained to them. We haven't been able to tell what kind of pills we are talking about."

Defendant then called William M. Harris who testified that he was a consultant for the Psychological Clinic at the University of Illinois. That he had known defendant for four or five years and saw him six days each week. That he saw defendant at the Elks Club about 11:00 P.M., on January 10th, was with him until 2:00 or 2:30 in the morning. Defendant was drinking. Harris and defendant left Elks Club at 1:00 A.M., went to Sportsmen's Club. Harris had seen defendant on prior occasions when he was intoxicated, was asked to compare his apparent intoxication on the night in question with that on previous occasions to which the Court sustained an objection.

Defendant then called Doctor Ruth Heifetz, a physician, employed by the College of Medicine of the University of Illinois, and by the Department of Mental Health of the State of Illinois, and she gave the following testimony outside the presence of the jury and made an offer of proof of the following testimony of Doctor Heifetz:

"I have treated patients who were under the influence of drugs. Defendant's Exhibit Two is a publication which provides a basic way of identifying drugs in terms of identifying a particular kind of capsule and then identifying its contents. The capsules shown on page 20 contains secobartital, commonly known as seconal. It is a medication used either for hypnotic effect, or sedative effect to put people to sleep. Its major effect is to depress the central nervous system. It is a drug authorized only on prescription. This booklet and many similar documents are used as a basic means of identifying drugs. When you take a history from a patient he may say he's taken pills of a certain color and you go to your desk reference book and look it up. [R. 171]. This booklet is the same kind of outlay which exists in the physician's reference book, which is the traditional reference used by the medical profession. I've never seen this particular one because it's put out specifically for law enforcement officers. *But an identical and somewhat expanded version exists in medical reference texts.*" R. 172.

On cross-examination the doctor testified that if a capsule were obtained from some source other than a pharmaceutical house, there was a possibility that the color code would not be accurate but that this was uncommon. The Court sustained the objection to the offer.

■■ The defendant urges that all of the foregoing testimony relating to drugs should have been admitted. We agree that the trial court erred in striking all of the testimony relating to defendant's use of drugs. The argot terms "reds, red devils, Christmas Trees" are in such widespread and common usage as to justify judicial notice that they refer to secobarbital. (*People v. Scott*, 36 Cal. Rptr. 402, 403; *People v. Hubbard*, 9 Cal. App.3rd 827, 830.) Defendant's Exhibit Two is a booklet entitled "300

Most Abused Drugs", published by Trend House for use by public officials concerned with the problems of drug abuse. The glossary of terms appearing at pps. 23 and 24 indicates that the argot term "Red Devils" denotes secobarbital. The Illinois Bureau of Investigation publication "Drug Abuse, Forfeiture of Freedom" notes that the argot terms for barbiturates includes "Christmas Trees" and we further note that the text "Narcotics and Narcotic Addiction" Maurer and Vogel (Charles C Thomas, 3rd 1969) recognizes the argot terms "Christmas Trees" and "red devil" as being descriptive of secobarbital. We therefore judicially notice that the argot term "red devils", "reds", and "Christmas Trees" refer to the drug secobarbital.

■■ The Defendant identified some of the capsules which he had taken, by reference to a colored picture which appeared on page 20 of Defendant's Exhibit Two. He described this as a capsule known to him as a "Christmas Tree". The capsule so identified contains secobarbital, a barbiturate. Doctor Heifetz testified that the Physician's Desk Reference is a traditional reference work used by the medical profession as a basic means of identifying drugs by appearance, and that Defendant's Exhibit Two was an identical, but abbreviated version of such commonly used texts. That often a patient will describe to a doctor the color and shape of capsules which he has taken, and on that basis comparison is made to the colored reproductions of the various capsules portrayed and the drug thus identified. Defendant's Exhibit Two should have been admitted into evidence as well as Defendant's identification of the capsules which he had consumed and identified by reference to the exhibit.

■ The trial court was correct in excluding the opinion testimony of the lay witnesses to the effect that defendant was under the influence of drugs. With proper foundation such testimony would be admissible (*State v. Johnson* (Sup.Ct. Wis., May 2, 1972), 196 N.W.2d 717.). Here no sufficient foundation was laid which would warrant the admission of lay opinion. The Court was also correct in excluding Doctor Heifetz's opinion since it was sought, not in the form of a hypothetical question predicated upon sworn testimony, but rather upon information related to her in a private interview with defendant.

■■ Several witnesses testified to seeing the defendant consume the capsules in question and testified as to defendant's appearance and actions thereafter. That he became drowsy, difficult to communicate with and became quiet. Some witnesses testified that they had, on previous occasions, seen defendant when he was intoxicated but were not permitted to contrast their observations of defendant's actions on those occasions with his actions after consuming the drugs. This, too, was

error. Comparison of defendant's conduct when intoxicated with his conduct following his ingestion of the capsules was relevant, material and of direct probative value on the issue of his alleged drugged condition. The exclusion of all of the evidence relating to defendant's drugged condition deprived defendant of a defense which he was entitled to present to the jury and therefore defendant's convictions on the two counts of attempt murder must be reversed and the cause remanded for new trial. Defendant's conviction for armed robbery is affirmed.

Lastly, defendant urges that the trial court erred in imposing sentence on all three convictions under the rule enunciated in *People v. Whittington* 46 Ill.2d 405, 265 N.E.2d 679. In view of our reversal of the convictions of attempt murder this issue is, at this point in time, no longer viable. Should defendant be retried and sentences again imposed the question as to whether *Whittingon, supra,* or *People v. Moore,* 51 Ill.2d 79, 281 N.E.2d 294, would be controlling would, of course, depend upon the evidence adduced on retrial. For these reasons we decline to consider this assignment of error.

Defendant's conviction of armed robbery is affirmed. The attempt murder convictions are reversed and those charges are remanded for new trial in conformity with the views herein expressed.

TRAPP, P. J., and SMITH, J., concur.