[Cite as *State v. Sullivan*, 2014-Ohio-1443.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellant, | : | |
| | : | No. 13AP-173 |
| v. | : | (C.P.C. No. 10CR-978) |
| Montie E. Sullivan, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on April 3, 2014

*Ron O'Brien*, Prosecuting Attorney, and *Steven L. Taylor*, for appellant.

*Joseph E. Scott*, for appellee.

APPEAL from the Franklin County Court of Common Pleas

T. BRYANT, J.

{¶ 1} Plaintiff-appellant, State of Ohio, appeals from a judgment of the Franklin County Court of Common Pleas granting the motion to suppress evidence filed by defendant-appellee, Montie E. Sullivan. For the following reasons, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On January 11, 2010, Corporal Richard Minerd of the Franklin County Sheriff's Office assumed the investigation of a series of home invasion robberies occurring between January 9 and 11, 2010. The robberies shared similar characteristics, as they: (1) occurred in the same geographic area, i.e., the eastern part of Franklin County, within a short timeframe; (2) involved two African-American males carrying firearms and wearing bandanas over their faces; (3) involved violent entry and shepherding of victims

into the bathroom while the perpetrators ransacked the homes; and (4) involved witnesses in two incidents who observed a white car fleeing the scene.

{¶ 3} The case file Corporal Minerd inherited included information received from the American Automobile Association ("AAA"). That information established that AAA had responded to a service call for a 1993 white Honda Civic and found instead a green Toyota Camry believed to have been stolen during one of the home invasions. Corporal Minerd subpoenaed the records from that AAA call. From those records, Corporal Minerd learned that the AAA card used by the caller had been stolen during another of the recent home invasions. He also learned that the call to AAA had been made from defendant's cell phone and that the 1993 white Honda Civic was registered to defendant at a Baltimore, Ohio address. Searches of other police-maintained databases revealed that both defendant and a relative of his, David L. White, were connected to an address at 2399 Hudson Bay Way. Corporal Minerd also learned from a separate source that White had been identified as using a credit card stolen during one of the home invasions.

{¶ 4} Later on January 11, 2010, Corporal Minerd began periodic visual surveillance on the Hudson Way Bay address. At times, the white Honda Civic was parked directly in front of that address; on other occasions, it was not. Corporal Minerd also followed the Civic several times as it traveled to various locations around Columbus. He did not witness any criminal activity associated with the Civic while conducting the visual surveillance.

{¶ 5} Because the visual surveillance was difficult to maintain due to the Civic's mobility and the limited manpower and resources in the sheriff's office, Corporal Minerd determined that surveillance could be conducted more effectively and efficiently through use of a global positioning system ("GPS") tracking device. According to Corporal Minerd, the purpose of attaching the GPS device to defendant's car and monitoring his whereabouts was to catch him in the act of committing a home invasion robbery. The sheriff's office did not have a written protocol regarding use of GPS devices; however, when Corporal Minerd questioned undercover narcotics officers about the issue, he was informed that a search warrant was not necessary before attaching a magnetized GPS device to a suspect's vehicle because that type of device did not require hardwiring to the vehicle.

{¶ 6} Accordingly, on January 14, 2010, without obtaining a search warrant, Corporal Minerd attached a GPS device under the rear bumper of the Civic while it was parked in an apartment complex parking lot which permitted public access. The device was small, with its own battery supply, and was not hardwired into the Civic's battery or electrical system. The device included software accessed via a remote laptop computer. The software depicted the Civic as a black dot on a mapping system. While the mapping system included street names, it did not display exact addresses; rather, it displayed the block on which the Civic traveled. The software also displayed the date, time, and speed at which the Civic traveled and permitted Corporal Minerd to observe the Civic in "real-time." Data captured by the device could be downloaded to create a historical record of the Civic's travel.

{¶ 7} During the next several days, Corporal Minerd monitored the GPS data three or four times a day. When the monitoring showed the Civic in an area it had frequently traveled in the past, Corporal Minerd would log off the website. His interest increased, however, when the monitoring showed the Civic in the general area where the home invasions had occurred.

{¶ 8} On January 23, 2010, Corporal Minerd logged onto the laptop computer and observed the Civic traveling slowly through a residential neighborhood in Fairfield County. At one point, the Civic stopped for approximately ten minutes in the 3400 block of Bickel Church Road. Suspicious of this activity, Corporal Minerd called the Fairfield County Sheriff's Office, identified himself as a law enforcement officer, explained what he was observing, and suggested that a deputy be dispatched to the area.

{¶ 9} Shortly thereafter, Corporal Minerd noted that the Civic had begun moving again. He then received a call from a dispatcher with the Fairfield County Sheriff's Office, who stated that he had just received a 911 call from a citizen reporting that his home, located at 3468 Bickel Church Road, had just been robbed by two African-American males who shot his dog and fled in a white car.

{¶ 10} Corporal Minerd monitored the Civic as it traveled directly from Fairfield County to the Hudson Bay Way address; he then notified his office of its location. The first officer to arrive at the scene radioed information that he had observed two African-American males run out the back door.

{¶ 11} Search warrants were obtained to search both the Hudson Bay Way residence and the Civic. Property from the Bickel Church Road robbery was discovered during the search of the Civic; property from previous robberies, including some occurring in Franklin County, was recovered from the residence. White and defendant were separately apprehended and taken into custody.

{¶ 12} On February 12, 2010, the state filed a multi-count indictment in the Franklin County Court of Common Pleas against defendant and White stemming from five home invasions occurring on January 9 through 11, 2010, and two home invasions occurring on January 20, 2010. Defendant and White were charged with aggravated burglary, aggravated robbery, kidnapping, attempted aggravated burglary, improperly discharging a firearm at or into a habitation, burglary, and theft. All but three of the charges carried firearm specifications. White was also charged with one count of receiving stolen property.

{¶ 13} On October 6, 2010, defendant filed a motion to suppress, contending that the warrantless attachment and monitoring of the GPS device on his automobile constituted an unlawful search and seizure in violation of the Fourth Amendment to the United States Constitution and that any evidence obtained as a result of such attachment/monitoring must be suppressed. The state filed a memorandum contra, asserting that the evidence at issue was obtained by constitutionally valid means and that no applicable exclusionary rule barred its admission.

{¶ 14} The trial court held a suppression hearing on January 11, 2011, during which the parties stipulated to the admission of transcripts from suppression hearings held in prosecutions against defendant and White on related charges in Fairfield County. The parties also stipulated that the 1993 white Honda Civic referenced in the testimony from those hearings was registered to and owned by defendant. No additional testimony was taken.[1]

{¶ 15} Following post-hearing briefing by the parties, the trial court, on May 9, 2011, issued a decision and order denying defendant's motion to suppress. The court found that, because the GPS device had been attached to defendant's vehicle while on

---

[1] The facts set forth above derive from the testimony offered at the suppression hearings in the Fairfield County prosecutions.

public property and monitored public travel, and because defendant never attempted to shield the vehicle from the public, defendant had no reasonable expectation of privacy and thus could not assert the protection of the Fourth Amendment.

{¶ 16} On January 23, 2012, the United States Supreme Court announced its decision in *United States v. Jones,* ____ U.S. ____ , 132 S.Ct. 945 (2012).  Thereafter, on February 3, 2012, defendant filed a motion for reconsideration based upon *Jones.* According to defendant, he was entitled to suppression of any evidence obtained as a result of the attachment and monitoring of the GPS device based upon his interpretation of *Jones* that the government's admission of evidence obtained through warrantless use of a GPS device violated the Fourth Amendment.

{¶ 17} The state filed a memorandum contra in which it conceded that reconsideration was warranted under *Jones.*  However, the state argued that defendant's motion to suppress lacked merit because *Jones* only held that GPS attachment and monitoring constituted a "search"; it did not hold that a warrant was required.  The state argued that in the present case: (1) use of the GPS device constituted a reasonable search that did not require a warrant; (2) use of the GPS device fell within the automobile exception to the warrant requirement; (3) the good-faith exception to the federal exclusionary rule applied; (4) no exclusionary rule exists under the Ohio Constitution, and (5) the inevitable discovery exception applied.[2]

{¶ 18} On August 29, 2012, the trial court held a hearing on defendant's motion for reconsideration.  Counsel for both parties offered argument regarding the application of *Jones* to the case; no additional evidence was submitted on the GPS attachment/monitoring issue.[3]

{¶ 19} On February 25, 2013, the trial court issued an entry sustaining defendant's motion to suppress.  That entry states in its entirety:

> This matter comes before the court on Defendant's Original
> Motion to Suppress and a Motion to Reconsider.  The parties
> have fully briefed the matter and stipulated to the transcript

---

[2] On appeal, the state advances no argument regarding the inevitable discovery exception; accordingly, any such argument has been abandoned.  *E. Liverpool v. Columbiana Cty. Budget Comm.,* 116 Ohio St.3d 1201, 2007-Ohio-5505, ¶ 3 (argument not raised in the party's brief is deemed to be abandoned).

[3] Although not germane to the instant case, we note that David White testified regarding statements he made to police following his arrest.

of a hearing before the Fairfield County Court of Common Pleas on April 23, 2010, representing to the Court that it would be the evidence presented at an oral hearing. Having consider[ed] the evidence, the Court finds that the State was obligated to get a warrant pursuant to *U.S. v. Jones*, (2012) 945 US _____, 132 S.Ct[.] 945.

The consideration now goes to whether there is an exception to the Motion to Suppress. While tap dancing around the issue, the state offers no credible argument to support any of their position[s]. They have not presented any evidence justifying the failure to acquire the warrant to attach the GPS device. The State's own witness testified that he did not have probable cause to search at the time of the attachment.

It is therefore ORDERED that any evidence directly resulting from the attachment of the GPS shall be suppressed from the time of the attachment of the GPS until the State obtained the subsequent warrant.

## II. ASSIGNMENTS OF ERROR

{¶ 20} The state timely appeals, advancing three assignments of error for review:

**FIRST ASSIGNMENT OF ERROR**

THE TRIAL COURT ERRED IN FAILING TO FIND THAT THE WARRANTLESS INSTALLATION AND MONITORING OF THE GPS DEVICE WAS A REASONABLE SEARCH.

**SECOND ASSIGNMENT OF ERROR**

THE TRIAL COURT ERRED IN FAILING TO FIND THAT THE WARRANTLESS INSTALLATION AND MONITORING OF THE GPS DEVICE WAS ALLOWED UNDER THE AUTOMOBILE EXCEPTION.

**THIRD ASSIGNMENT OF ERROR**

THE TRIAL COURT ERRED WHEN IT FAILED TO ADDRESS AND SUSTAIN THE APPLICABILITY OF THE GOOD-FAITH EXCEPTION TO THE FEDERAL EXCLUSIONARY RULE.

## III.  DISCUSSION

### A.  Motion to Suppress

{¶ 21} The state's assignments of error challenge the trial court's decision granting defendant's motion to suppress.  "Appellate review of a motion to suppress presents a mixed question of law and fact."  *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8.  In considering a motion to suppress, the trial court assumes the role of fact finder and thus is in the best position to resolve factual questions and evaluate witness credibility.  *Id.,* citing *State v. Mills,* 62 Ohio St.3d 357, 366 (1992).  An appellate court must therefore accept the trial court's factual findings if they are supported by competent, credible evidence.  *Id.,* citing S*tate v. Fanning,* 1 Ohio St.3d 19 (1982).  Accepting those facts as true, an appellate court must then independently determine, without deference to the trial court's conclusion, whether the facts satisfy the applicable legal standard.  *Id.,* citing *State v. McNamara,* 124 Ohio App.3d 706 (4th Dist.1997).

### B.  Fourth Amendment – Search and Seizure

{¶ 22} The Fourth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *State v. Ford,* 10th Dist. No. 07AP-803, 2008-Ohio-4373, ¶ 19.  "Searches and seizures conducted without a warrant are per se unreasonable unless they come within one of the ' "few specifically established and well delineated exceptions." ' "  *Id.,* quoting *Minnesota v. Dickerson,* 508 U.S. 366, 372, 113 S.Ct. 2130 (1993), quoting *Thompson v. Louisiana,* 469 U.S. 17, 20, 105 S.Ct. 409 (1984).  "Those seeking exemption from the warrant requirement bear the burden of establishing the applicability of one of the recognized exceptions."  *State v. Fisher,* 10th Dist. No. 10AP-746, 2011-Ohio-2488, ¶ 17, citing *State v. Lowry,* 4th Dist. No. 96CA2259 (June 17, 1997). "The Ohio Supreme Court has explicitly recognized the following seven exceptions to the requirement that a warrant be obtained prior to a search: (a) a search incident to a lawful arrest; (b) consent signifying waiver of constitutional rights; (c) the stop-and-frisk doctrine; (d) hot pursuit; (e) probable cause to search, and the presence of exigent circumstances; (f) the plain-view doctrine; or (g) an administrative search."  *State v. Atchley,* 10th Dist. No. 07AP-412, 2007-Ohio-7009, ¶ 6, citing *State v. Price,* 134 Ohio App.3d 464, 468 (9th Dist.1999).

### C. The United States Supreme Court's decision in *Jones*

{¶ 23} Antoine Jones became the target of a police investigation into his alleged drug trafficking. The investigation included the use of visual surveillance and wiretapping. Based in part on information gathered from these sources, the police sought a warrant authorizing the use of a GPS tracking device on Jones's wife's car. A judge issued the warrant, which authorized installation of the device within ten days in the District of Columbia. On the 11th day, and not in the District of Columbia but in Maryland, police installed the device on the undercarriage of the vehicle while it was parked in a public parking lot. Police monitored the vehicle's movements for the next 28 days. The device relayed more than 2,000 pages of data related to the vehicle's movements during this time period.

{¶ 24} The government used this data to indict Jones on multiple counts of drug trafficking. Jones filed a motion to suppress evidence obtained through the GPS device. The district court granted the motion in part, suppressing the data obtained while the vehicle was parked on Jones's private property. However, the court admitted the data obtained while the vehicle traveled on public thoroughfares; this data connected Jones to a location that contained cash and narcotics. Following one hung jury and another indictment, Jones was eventually convicted of drug trafficking and sentenced to life imprisonment.

{¶ 25} The United States Court of Appeals for the District of Columbia Circuit reversed the conviction. *United States v. Maynard,* 615 F.3d 544 (D.C.Cir.2010). The government then appealed, and the United States Supreme Court granted *certiorari.*

{¶ 26} The Supreme Court held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search' " within the meaning of the Fourth Amendment. *Jones,* 132 S.Ct. at 949. The majority opinion, authored by Justice Scalia and joined by four other justices, did not rely on the "reasonable expectation of privacy" test enunciated in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507 (1967). Rather, the majority held that the attachment of a GPS device to a suspect's private property for the purpose of monitoring that suspect's movements to obtain information is a trespass, which constitutes a Fourth Amendment search. *Jones* at 949-50. The majority stated that the *Katz* "reasonable expectation of

privacy" standard augmented, but did not displace or diminish, the long-standing trespass doctrine. *Id.* at 951-52.

{¶ 27} Justice Sotomayor joined the majority opinion but wrote separately to opine that GPS monitoring qualified as a search under the separate theory that it violated a suspect's reasonable expectation of privacy. *Id.* at 955-56 (Sotomayor, J., concurring). In a concurring opinion joined by the four remaining justices, Justice Alito criticized the majority's reliance on the trespass-to-property theory. Justice Alito opined that the *Katz* reasonable expectation of privacy standard governed the case. *Id.* at 954. Applying it to the facts, he concluded that installation of a GPS device coupled with long-term monitoring constitutes a search. *Id.*

{¶ 28} The United States Supreme Court found that the government, having failed to raise the issue in the trial court, forfeited its alternative argument that, even if the attachment and use of the GPS device constituted a search, such search was reasonable–and thus lawful–under the Fourth Amendment because the officers had both reasonable suspicion and probable cause to believe that Jones was involved in drug trafficking. *Id.* at 954.

{¶ 29} *Jones* thus left several important questions unanswered. The Supreme Court did not determine whether police officers must obtain a search warrant before attaching and monitoring a GPS device, or, if a warrant is not required, what degree of suspicion (reasonable suspicion, probable cause) would support a warrantless search. *Id.* at 954. The Supreme Court also did not decide whether the federal exclusionary rule would require suppression of evidence obtained if a Fourth Amendment violation occurred. *Id.* at 964, fn. 11. Accordingly, contrary to the trial court's conclusion in the instant case, the Supreme Court's holding in *Jones* is not dispositive of the constitutionality of the GPS attachment/ monitoring on defendant's vehicle. Thus, we must consider the issues left unresolved by *Jones*.

### D. First Assignment of Error – Reasonable Suspicion

{¶ 30} In its first assignment of error, the state contends the trial court erred in failing to find that the warrantless attachment and monitoring of the GPS device constituted a reasonable search.

{¶ 31} The United States Supreme Court has stated that, pursuant to its "general Fourth Amendment approach," it "examine[s] the totality of the circumstances" to determine the reasonableness of a search or seizure under the Fourth Amendment. *Samson v. California,* 547 U.S. 843, 848, 126 S.Ct. 2193 (2006). Under that analysis, the reasonableness of a search or seizure "is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.*

{¶ 32} Here, the state argues that, "[b]ecause installation/use of a GPS device is, at most, only minimally intrusive and rarely yields truly private information, and because GPS surveillance is a critically important law enforcement tool that often may be most important in the inception of an investigation when probable cause is lacking, the Fourth Amendment balancing test should not require probable cause or a warrant as a prerequisite to use of GPS." (State's Brief, 14.) The state further maintains that "reasonable suspicion" supported the installation/monitoring of the GPS device in this case, based on "the involvement of defendant's white Honda Civic in the AAA phone call involving the use of a AAA card of one home-invasion victim and involving the Toyota Camry robbed from a victim in a second home invasion." (State's Brief, 18-19.)

{¶ 33} In support of its argument that neither a warrant nor probable cause was required before attachment/monitoring of the GPS device, the state relies on several United States Supreme Court cases–none of which, we note, involved GPS attachment/monitoring.

{¶ 34} The state first contends that warrantless GPS tracking is justified based on the rationale of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868 (1968). In *Terry,* the United States Supreme Court held that a police officer could "stop" an individual on the street for questioning and then "frisk" the individual to determine whether he or she was carrying weapons. *Id.* at 22-27. Specifically, the Supreme Court held that a warrantless search (the stop) was permissible when based on less than probable cause if the "police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Id.* at 30. With regard to the search (the frisk), the Supreme Court clarified that a search was permitted when the officer reasonably believed that "the person[ ] with whom he is dealing may be armed and

presently dangerous * * * and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety." *Id.* The Supreme Court averred that such a search, given that it is performed without probable cause, "must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby, and may realistically be characterized as something less than a 'full' search." *Id.* at 26.

{¶ 35} Clearly, the *Terry* rationale does not justify the attachment and monitoring of a GPS tracking device. The frisk in *Terry* involved a pat-down of an individual, limited to a specific instance in time and limited to ascertaining whether the individual was armed or otherwise posed a danger to officer safety. A GPS search, in contrast, is an ongoing trespass that, while it continues, creates a significant record in detail of a person's public movements using the vehicle upon which it has been placed.

{¶ 36} The court in *United States v. Ortiz,* 878 F.Supp.2d 515, 533 (E.D. Penn. 2012), a post-*Jones* case, summarized the difference:

> GPS installation and monitoring—involving a trespass to property and tracking of a vehicle's whereabouts indiscriminately for over a month—is simultaneously more intrusive than a *Terry* stop-and-frisk and less justified by a need to dispel suspicion about "rapidly unfolding and often dangerous situations on city streets." *See Terry,* 392 U.S. at 10, 88 S.Ct. 1868. As *Terry* made clear, its holding applied to "an entire rubric of police conduct-necessarily swift action predicated upon the on-the-spot observations of the officer on the beat." 392 U.S. at 21, 88 S.Ct. 1868. That "rubric" is simply not the same as the one in which the government seeks to justify the warrantless use of GPS trackers on vehicles. The government does not argue that GPS trackers are devices employed in the heat of the moment to track suspects with the goal of averting imminent crime; instead, the government's usual interest in using GPS trackers is to *collect* evidence for an investigation.

(Emphasis sic.)

{¶ 37} None of the other cases upon which the state relies justify warrantless GPS attachment/monitoring. In *United States v. Knights,* 534 U.S. 112, 122 S.Ct 587 (2001), the United States Supreme Court held that the warrantless search of a probationer's apartment, supported by reasonable suspicion and authorized by a condition of his

probation that he submit to search at any time, with or without a search or arrest warrant or reasonable cause, by any probation or law enforcement officer, was reasonable within the meaning of the Fourth Amendment. In evaluating the degree of intrusion into Knight's privacy, the Supreme Court found his probationary status "salient," observing that probation is on a continuum of possible punishments and that probationers "do not enjoy 'the absolute liberty' " of other citizens. *Id.* at 118-19. The Supreme Court also found probation searches necessary to promote legitimate governmental interests of integrating probationers back into the community, combating recidivism, and protecting potential victims.

{¶ 38} The Supreme Court concluded that, "[a]lthough the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable. * * * Those interests warrant a lesser than probable-cause standard here. When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." (Internal citations omitted.) *Id.* at 592-93.

{¶ 39} In *Samson,* 547 U.S. 843, the United States Supreme Court held that the suspicionless search of a parolee, based upon a California statute that required every parolee to agree in writing to be subject to search or seizure by a parole officer or other peace officer, with or without a search warrant and with or without cause, and based solely on parolee status, did not violate the Fourth Amendment. The Supreme Court found that a parolee has severely diminished expectations of privacy because, while he or she may be out of the physical custody of the prison system, he or she remains in the legal custody of such system for the remainder of his or her prison term and must comply with the terms and conditions of his or her parole. The Supreme Court further found that the state's interest in reducing recidivism, thereby promoting reintegration and positive citizenship by parolees, warranted privacy intrusions that would otherwise not be tolerated under the Fourth Amendment.

{¶ 40} In *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733 (1985), the United States Supreme Court upheld a public school official's search of a student's purse based on reasonable suspicion. The Supreme Court found that striking the balance between students' legitimate expectations of privacy and the school's equally legitimate need to maintain an environment in which learning can occur requires some easing of the restrictions to which searches by public authorities are ordinarily subject. The Supreme Court concluded that "the accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law. Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." *Id.* at 742-43. Accordingly, the Supreme Court held that school officials need not obtain a warrant before searching a student who is under their authority.

{¶ 41} *Knights, Samson,* and *T.L.O.* do not support the state's argument for substantially similar reasons. Those cases involved searches of persons who very clearly had reduced expectations of privacy due to their statuses as probationer, parolee, and student, respectively–persons who were under some form of state authority at the time the searches were conducted. Here, defendant was under no comparable state authority at the time of the GPS attachment/monitoring in this case. Further, the governmental interests advanced in *Samson* and *Knights*–integrating probationers and parolees back into the community and combating recidivism–are not at issue in GPS tracking cases. Nor does the governmental interest advanced in *T.L.O* –maintaining order in schools– apply to GPS tracking cases.

{¶ 42} The other cases cited by the state are also inapposite. In *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637 (1983), the United States Supreme Court held that investigative detention of a traveler's luggage based upon reasonable suspicion that the luggage contained narcotics was permissible. However, the Supreme Court further held that the 90-minute detention of the luggage rendered the seizure unreasonable in the absence of probable cause and that the violation of the defendant's Fourth Amendment rights was exacerbated by the failure of government agents to accurately inform the

defendant of the place to which they were transporting the luggage, the length of time he might be dispossessed of the luggage, and what arrangements could be made for the return of the luggage if the investigation dispelled their suspicions. Accordingly, the Supreme Court concluded that the evidence obtained from the search of the luggage was inadmissible. In contrast to *Place,* no evidence in the instant case establishes that the police had a reasonable suspicion that defendant's car contained contraband at the time the GPS device was installed. Moreover, the Supreme Court's ultimate holding in *Place,* i.e., that the 90-minute detention of the luggage was sufficient to render the seizure unreasonable in the absence of probable cause, supports the unreasonable nature of the 9-day "search" in the instant case.

{¶ 43} In *United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074 (1976), the United States Supreme Court held that vehicle stops at a fixed checkpoint for brief questioning of its occupants, even in the absence of any individualized suspicion that the particular vehicle contained illegal aliens, was consistent with the Fourth Amendment and that the operation of a fixed checkpoint need not be authorized in advance by a judicial warrant. In so holding, the Supreme Court noted the federal government's legitimate interest in protecting its territorial integrity, an interest clearly not involved here.

{¶ 44} Although we have determined that the foregoing cases do not compel the conclusion advanced by the state, we nonetheless consider the state's specific argument that application of the "balancing test" between individual privacy rights and promotion of legitimate governmental interests establishes the reasonableness of the GPS search here. The state contends that GPS attachment and monitoring of a suspect's vehicle is justified without a warrant or probable cause because: (1) individuals have a diminished expectation of privacy when traveling on public roads; (2) the intrusion occasioned by attachment of a tracking device is minimal; and (3) the information gathered is less detailed than would be achieved through visual or aural means of surveillance. The state notes that the GPS device does not reveal who is driving the car, what the occupants are doing while inside the car, or what the occupants do when they arrive at their destination –all information that could be revealed by traditional visual surveillance. The state further notes that attachment of a GPS device does not require the removal of anything from the vehicle or entry into any enclosed area of the vehicle. The state finally maintains that the

minimal protection of an individual's privacy, if any, resulting from the necessity of obtaining a warrant before attaching and monitoring a GPS device would come at great expense to law enforcement investigation in cases involving serious crimes like drug trafficking, terrorism, organized crime and the like.

{¶ 45} At least two federal district courts have rejected post-*Jones* governmental arguments that a lesser standard than a warrant and probable cause should apply to the attachment and monitoring of a GPS device under the Fourth Amendment "totality of the circumstances" test.    In *Ortiz,* 878 F.Supp.2d 515, the court considered identical arguments to those raised by the state here regarding the balancing of privacy interests with governmental interests.  The court first observed that " '[i]n most criminal cases,' the balancing analysis weighs 'in favor of the procedures described by the Warrant Clause of the Fourth Amendment.' "   *Id.* at 529, quoting *Skinner v. Ry. Labor Execs.' Assn.,* 489 U.S. 602, 619, 109 S.Ct. 1402 (1989).  The court noted, however, that "the Supreme Court has recognized exceptions to the presumption in favor of requiring a warrant 'when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." ' " *Ortiz* at 529, quoting *Skinner* at 619.  The court concluded that "balancing the intrusion on an individual's Fourth Amendment interests occasioned by GPS installation and monitoring with the legitimate government interests in doing so does not justify an exception to the warrant-and-probable-cause requirement in run-of-the-mill law enforcement situations." *Id.* at 530.

{¶ 46} In so concluding, the court engaged in extensive discussions pertaining to both privacy interests and governmental interests.   Because these discussions are germane to the instant case, we summarize here the principles and authorities discussed.

{¶ 47} Regarding privacy interests, the court pointed out that there are two separate components to the infringement on Fourth Amendment rights occasioned by use of GPS trackers: installation governed by the United States Supreme Court's holding in *Jones* that installation of a GPS tracker is a trespass on personal property that is highly repugnant to the Fourth Amendment, and the privacy interest infringed by monitoring of the GPS device, an issue that *Jones* did not reach. In its discussion of the latter, the *Ortiz* court observed the difference, at 530-32:

It is true, as the government points out, that "the Fourth Amendment has been construed, practically since the beginning of the [United States] government, as recognizing a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon, or automobile for contraband goods, where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought."  * * * The Supreme Court has also held that "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another."  * * *   Relying on the diminished expectations of privacy in a vehicle, the government asserts that GPS monitoring for a period of about a month should not be viewed as a grave intrusion on privacy rights, given that the GPS tracker "does not reveal who is in the car as driver or passenger, what the occupants are doing, or what they do when they arrive at their destination" and "provides information only about the vehicle's location." * * *

The government's argument overemphasizes what GPS trackers cannot do and understates what they can do.  The trackers provide information about the vehicle's whereabouts by periodic pings twenty-four hours a day for approximately one month without regard to where the vehicle goes, who drives it, or whether the agents are still actively monitoring it. Because technology has evolved in the intervening years, GPS trackers work differently from the beepers the Supreme Court considered in [*United States v.*] *Knotts* [460 U.S. 276, 281, 103 S.Ct. 1081 (1983)], and [*United States v.] Karo* [468 U.S. 705, 712, 104 S.Ct. 3296], and GPS trackers have the potential to be significantly more intrusive.  As Agent Pedrini testified, the GPS trackers monitor a vehicle's location around the clock at set periods, logging the location remotely for agents to access later on.  By contrast, the beepers broadcasted a signal that was only helpful to law enforcement authorities while they were in close proximity to the beeper. *See Knotts,* 460 U.S. at 278, 103 S.Ct. 1081.  In fact, the officers in both *Knotts* and *Karo* mostly used the beepers in conjunction with simultaneous visual surveillance. *See Knotts,* 460 U.S. at 278, 103 S.Ct. 1081; *Karo,* 468 U.S. at 708, 104 S.Ct. 3296.  Even more damaging to the government's argument is that the GPS tracker, if it produces location data while inside the garage of a home or other Fourth Amendment-protected place, has the potential to yield information that the Supreme Court

specifically found in *Karo* to be protected by the Fourth Amendment:

"[A]n unreasonable search within the meaning of the Fourth Amendment . . . [occurs] where, without a warrant, the Government surreptitiously employs an electronic device to obtain information that it could not have obtained by observation from outside the curtilage of the house. The beeper tells the agent that a particular article is actually located at a particular time in the private residence and is in the possession of the person or persons whose residence is being watched. Even if visual surveillance has revealed that the article to which the beeper is attached has entered the house, the later monitoring not only verifies the officers' observations but also establishes that the article remains on the premises." 468 U.S. at 715, 104 S.Ct. 3296.

{¶ 48} Upon the foregoing analysis, the court concluded that "the installation of the GPS tracker and subsequent monitoring constitute a significant intrusion on Fourth Amendment privacy rights." *Id*. at 532.

{¶ 49} As to governmental interests, the court stated: "The government argues that 'obtaining a warrant before installing a tracking device on a vehicle would come at great expense to law enforcement investigations.' " * * * "This argument is both unsupported by the evidence and legally unpersuasive."

{¶ 50} The court observed that the agent installing the GPS device did not get a warrant because he did not think he needed one, not because some exigent circumstance prevented him from doing so and that there is no claim or evidence that getting a warrant would have interfered with the investigation.

{¶ 51} As to the government's attempted legal justification for the use of GPS trackers based on reasonable suspicion, the court found such also to be unpersuasive, explaining:

To justify an exception to the warrant requirement, the government needs to show "special needs, *beyond the normal need for law enforcement." Skinner,* 489 U.S. at 619, 109 S.Ct. 1402 (emphasis added). To be sure, the Supreme Court "has identified various law enforcement actions that qualify as Fourth Amendment searches or seizures but that may still be conducted without either a warrant or probable cause." * * * However, the cases the government cites * * * fall outside the

> rubric of routine law enforcement and within the rubric of "special needs." They are cases about probationers' diminished privacy interests and states' "dual interest in integrating probationers back into the community and combating recidivism." * * * They are cases about the federal government's "inherent authority to protect, and a paramount interest in protecting, its territorial integrity." * * * They are cases about the "substantial need of teachers and administrators for freedom to maintain order" in schools. * * * They are cases about the need to keep police officers safe from unseen and unknown harm during arrests in a home. * * * Unlike the case before the Court, the cases cited by the government are not about routine law enforcement investigative activity in a criminal context.

*Id.*

{¶ 52} For the above-stated reasons, the court determined that "the intrusion on Fourth Amendment privacy interests occasioned by GPS tracker installation and monitoring is substantial and that the government has not identified any legitimate law enforcement need to use such devices beyond 'the normal need for law enforcement.' " *Id.* at 533. Accordingly, the court concluded that the GPS installation and monitoring could not be justified by a showing of reasonable suspicion. *Id.* Having so concluded, the court did not determine whether the law enforcement agents in the case had reasonable suspicion when the GPS trackers were installed. *Id.* at fn. 9.

{¶ 53} In *United States v. Ford,* case No. 1:11-CR-42 (E.D.Tenn.2012), another post-*Jones* case in which the government argued that a lesser standard than the warrant-and-probable-cause standard applied to GPS installation and monitoring cases, the court held:

> Both prongs of the totality of the circumstances test weigh in favor of applying the traditional warrant requirement to GPS tracking device cases. With regard to the privacy prong, the *Jones* Court did not focus its analysis on the privacy invaded by the attachment of a GPS device to a suspect's vehicle. Rather, the Court concluded the physical trespass committed against a suspect's property was sufficient to incur Fourth Amendment scrutiny. * * * In light of *Jones,* whatever diminished privacy interest a suspect has on the exterior of his vehicle still counsels in favor of traditional Fourth Amendment protection. Further, GPS tracking as a class has the potential to report a suspect's movements on private

> property, which is typically protected from government surveillance. * * * Second, with respect to the government's legitimate interests, no government interest compels a lesser standard in GPS tracking cases. In fact, because tracking will usually occur in preliminary investigation stages, as happened in this case, there is simply no reason a warrant could not be obtained prior to placing a GPS device on a suspect's vehicle. Indeed, the government in *Jones* had obtained a warrant, but violated its requirements. * * * The Court concludes the traditional warrant requirement is appropriate in GPS cases.

*Id.*

{¶ 54} As noted above, the state in the instant case advances nearly identical arguments to those considered and rejected in *Ortiz* and *Ford*. Although this court is not bound by rulings on federal statutory or constitutional law made by a federal court other than the United States Supreme Court, we nonetheless may accord these decisions some persuasive weight. *State v. Burnett,* 93 Ohio St.3d 419, 424 (2001). Such cases are particularly persuasive where, as here, the state does not direct this court to any case law addressing whether a warrant is required before attaching and monitoring a GPS tracking device in the aftermath of *Jones.*

{¶ 55} As in *Ortiz* and *Ford,* the state here overemphasizes what GPS monitoring cannot show and underestimates what it can show. While there are limitations on the data the GPS monitoring provided, as it showed only where the tracked vehicle was located, not who was driving it or what its occupants were doing, the GPS technology permitted Corporal Minerd to track the vehicle's whereabouts 24 hours a day, seven days a week, no matter who was driving the vehicle or where it was driven. The GPS device also permitted Corporal Minerd to track the vehicle in real time or at set intervals at his convenience. Accordingly, the GPS monitoring had the significant potential to yield protected information, such as the location of the tracked vehicle at places which would normally be protected from physical police surveillance. Furthermore, the "special needs" doctrine does not apply to this case. The state has not articulated a particularized interest beyond the general interest in law enforcement. Indeed, the state's evidence establishes that the sole purpose of attaching and monitoring the GPS device was to aid in the investigation. Under the "special needs" doctrine, the primary purpose of a search cannot be to "generate evidence for law enforcement purposes." *Id.*

{¶ 56} For the foregoing reasons, as well as those articulated in *Ortiz and Ford,* we conclude that the GPS attachment and monitoring in the instant case could not be justified by a showing of reasonable suspicion.

{¶ 57} Because the police cannot justify a warrantless GPS search with reasonable suspicion alone, we need not determine whether the police had reasonable suspicion when the GPS device was attached.

{¶ 58} The first assignment of error is overruled.

### E.     Second Assignment of Error–Probable Cause and the Automobile Exception

{¶ 59} In its second assignment of error, the state contends the trial court erred in failing to find that the warrantless attachment and monitoring of the GPS device was permitted under the automobile exception to the Fourth Amendment warrant requirement.  The fact that this case involves an automobile does not automatically entitle the state to the shelter of the automobile exception. In *Ortiz,* 878 F.Supp.2d 515, the court noted that the automobile exception "permits 'warrantless searches of *any part of a vehicle that may conceal evidence * * ** where there is probable cause to believe *that the vehicle contains evidence of a crime.*' " (Emphasis sic.) *Id.* at 535, quoting *United States v. Salmon,* 944 F.2d 1106, 1123 (3d Cir.1991).  "The authority is uniform that the automobile exception permits a search of the vehicle's interior, including of a container within a vehicle, when there is probable cause to believe contraband is contained therein." *Ortiz* at 535.  The exception acknowledges that vehicles are readily mobile, making it impractical and perhaps even impossible to secure a warrant before contraband or other evidence of a crime is transported out of the reach of law enforcement.  *Id.* at fn. 11.

{¶ 60} The state has not provided any case law expanding the automobile exception to permit warrantless GPS attachment and monitoring. The rationale underlying the automobile exception does not justify the warrantless installation of a GPS device under the facts presented here.  The state presented no evidence that it had probable cause to believe that defendant's vehicle contained contraband or evidence of a crime at the time the GPS device was installed, i.e., at the time of the "search."  Rather, the state's evidence established that the sole purpose of attaching and monitoring the GPS

device was to aid in the investigation with the hope of catching defendant in the act of committing a home invasion.

{¶ 61} Moreover, it is clear that the exigency rationale for the automobile exception does not justify extending it to cover warrantless attachment and monitoring of a GPS device. The automobile exception applies when there is no time to apply to a magistrate because "an immediate intrusion is necessary if police officers are to secure the illicit substance." *United States v. Ross,* 456 U.S. 798, 806, 102 S.Ct. 2157 (1982). Here, there was ample time for the police to obtain a warrant before attaching the GPS device to defendant's car. As noted above, Corporal Minerd's purpose in installing the GPS device was to further his investigation. The state presented no evidence establishing that the attachment was based on any concern about a fleeting opportunity to seize contraband or other evidence of a crime or to thwart imminent criminal activity. Thus, the "ready mobility" of automobiles underpinning the reason for the automobile exception does not in this case present a justification for extending application of the automobile exception to permit GPS tracking. As noted by the *Ortiz* court, "[t]he Supreme Court could broaden the automobile exception to cover circumstances in which government agents have probable cause to believe that a vehicle is being used in furtherance of criminal activity. The present state of the law, however, does not authorize such an extension*." *Id.* at 536. We agree with the reasoning in *Ortiz.*

{¶ 62} Further, attaching and monitoring a GPS tracking device does not serve the purposes of the automobile exception permitting the police to intrude into a vehicle to retrieve existing evidence the police believe to be inside, for the GPS search does not deal with existing evidence, but is used to discover evidence that might some time in the future be placed in the vehicle. However worthy that purpose may be, it does not excuse failure to fulfill the warrant requirement.

{¶ 63} Therefore, we hold that the automobile exception does not apply to permit the state's warrantless attachment and monitoring of the GPS tracking device in the instant case. Because we conclude that the automobile exception does not apply and the state did not obtain a warrant, we do not reach the issue of whether the state had probable cause at the time the GPS device was attached.

{¶ 64} The second assignment of error is overruled.

## F. Third Assignment of Error—The Good-Faith Exception

{¶ 65} In its third assignment of error, the state contends the trial court erred when it failed to address and apply the good-faith exception to the federal exclusionary rule. Specifically, the state argues that, even if the GPS search in this case was unlawful, suppression of the evidence is unwarranted pursuant to the good-faith exception.

{¶ 66} Generally, evidence obtained as a result of a search that violates the Fourth Amendment must be excluded as representing the fruit of the poisonous tree. *Columbus v. Sheperd,* 10th Dist. No. 10AP-483, 2011-Ohio-3302, ¶ 42, citing *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407 (1963). This "exclusionary rule" does not apply, however, in every instance in which the Fourth Amendment has been violated. *Herring v. United States,* 555 U.S. 135, 140, 129 S.Ct. 695 (2009), citing *Illinois v. Gates,* 462 U.S. 213, 223, 103 S.Ct. 2317 (1983). As the Supreme Court acknowledged in *Herring,* "exclusion 'has always been our last resort, not our first impulse[.]' " *Id.,* quoting *Hudson v. Michigan,* 547 U.S. 586, 591, 126 S.Ct. 1159 (2006).

{¶ 67} "The exclusionary rule is not an individual right and applies only where it ' "result[s] in appreciable deterrence." ' " *Herring* at 141, quoting *United States v. Leon,* 468 U.S. 897, 909, 104 S.Ct. 3406 (1984), quoting *United States v. Janis,* 428 U.S. 433, 454, 96 S.Ct. 3021 (1976). Deterrence alone is insufficient to justify the exclusionary rule, however, as "the benefits of deterrence must outweigh the costs [of excluding evidence]," such as "letting guilty and possibly dangerous defendants go free." *Herring* at 141. In keeping with this principle, the exclusionary rule generally applies where police exhibit "deliberate, reckless, or grossly negligent" disregard for Fourth Amendment rights. The rule does not apply, however, "when police act with an objectively reasonable good-faith belief" that their conduct is lawful. *Davis v. United States,* ____ U.S. ____ (2011), 131 S.Ct. 2419, 2427.

{¶ 68} In *Davis*, the defendant moved to suppress evidence found during the search of a vehicle in which he was a passenger; the search occurred after he and the driver were handcuffed and placed in a police cruiser. At the time of the search, precedent from the United States Supreme Court and the Eleventh Circuit permitted police to search vehicles contemporaneously with arrests of recent occupants regardless

of whether the occupants were within reach of the vehicle. The trial court denied the defendant's motion, and he was subsequently convicted.

{¶ 69} Thereafter, in *Arizona v. Gant,* 556 U.S. 332, 129 S.Ct. 1710 (2009), the United States Supreme Court held that a vehicle search is not automatically permitted unless the occupants are still " 'unsecured and within reaching distance of the passenger compartment at the time of the search.' " *Id.* at 2425 (quoting *Gant,* 556 U.S. at 343). The *Davis* court held that "searches conducted in objectively reasonable reliance on *binding appellate precedent* are not subject to the exclusionary rule." (Emphasis added.) *Id.* at 2421. Because the police acted in good faith in relying on binding appellate precedent at the time of the search, the Supreme Court upheld the trial court's holding that the exclusionary rule should not apply in the defendant's case. The Supreme Court compared this extension of the exclusionary rule to cases in which police had relied on subsequently enacted legislation or invalid search warrants.

{¶ 70} Here, the state contends that Corporal Minerd acted in good faith in concluding there was no need to obtain a warrant prior to attaching the GPS device to defendant's car because the United States Supreme Court had not yet decided *Jones,* and "a number of Ohio and federal appellate courts had concluded that the installation/monitoring of a GPS did not require a warrant because no reasonable expectation of privacy was invaded and therefore no 'search' was involved." (State's Brief, 35.)

{¶ 71} Initially, we find untenable the state's reliance on two Ohio cases, *State v. Winningham,* 1st Dist. No. C-110134, 2011-Ohio-6229, and *State v. Johnson,* 190 Ohio App.3d 750, 2010-Ohio-5808 (12th Dist.2010) ("*Johnson I*") and one federal appellate case, *United States v. Marquez,* 605 F.3d 604 (8th Cir.2010), as these cases were decided after the attachment of the GPS device in this case. In no event can these subsequent holdings permit a conclusion that Corporal Minerd acted in good faith in reliance upon them.

{¶ 72} Further, as the state acknowledges in its brief, the conclusions reached in the remaining two federal appellate cases, *United States v. Garcia,* 474 F.3d 994 (7th Cir.2004), and *United States v. Pineda-Moreno,* 591 F.3d 1212 (9th Cir.2010), i.e., that GPS attachment/monitoring does not constitute a Fourth Amendment search, were

based primarily on the logic underlying the beeper-technology cases, i.e., *United States v. Knotts,* 460 U.S. 276, 103 S.Ct. 1081 (1983), and *United States v. Karo*, 468 U.S. 705, 104 S.Ct. 3296 (1984). However, that logic is inapposite to GPS attachment/monitoring. First, neither *Knotts* nor *Karo* involved a physical trespass by the police onto the target vehicle; rather, in both cases, the police placed the beeper inside a container which was then loaded into the target vehicle by the driver (with the container owner's permission). Second, the relatively unsophisticated beeper technology at issue in *Knotts* and *Karo* is significantly different from the advanced technology utilized in GPS tracking devices.

{¶ 73} Moreover, the *Knotts* court expressed its concern that the power to conduct public surveillance using beepers might allow "dragnet-type law enforcement." *Id.* at 284. It also reserved the specific question of whether a warrant would be required in a case involving more intense surveillance techniques and stated that, "if such dragnet-type law enforcement practices * * * should eventually occur, there will be time enough then to determine whether different constitutional principles may be applicable." *Id.*

{¶ 74} Since *Jones* was decided, three Ohio appellate courts have considered and rejected state-sponsored arguments urging application of the good-faith exception to the federal exclusionary rule in GPS attachment/monitoring cases. *See State v. Henry,* 2d Dist. No. 11-CR-829, 2012-Ohio-4748; *State v. Allen,* 11th Dist. No. 2011-L-157, 2013-Ohio-434; and *State v. Allen,* 8th Dist. No. 99289, 2013-Ohio-4188. These courts have held that the good-faith exception was not available because no "binding appellate precedent" authorized the warrantless attachment/monitoring of GPS devices.

{¶ 75} In *Henry,* the Second District Court of Appeals rejected an identical argument made by the state here, i.e., that the good-faith exception to the federal exclusionary rule applies because the police officer who attached and monitored the GPS device did so in objectively reasonable reliance on persuasive, non-binding judicial authority in other jurisdictions. In so doing, the court observed that the *Davis* opinion itself contradicted the state's argument:

> The defendant in that case, Davis*,* argued that "applying the good-faith exception to searches conducted in reliance on binding precedent will stunt the development of Fourth Amendment law. With no possibility of suppression, criminal defendants will have no incentive * * * to request that courts

overrule precedent." 131 S.Ct. 2432. In response to this argument, Justice Alito wrote:

"And in any event, applying the good-faith exception in this context will not prevent judicial reconsideration of prior Fourth Amendment precedents. In most instances, as is in this case, the precedent sought to be challenged will be a decision of a Federal Court of Appeals or State Supreme court. But a good-faith exception for objectively reasonable reliance on binding precedent will not prevent review and correction of such decisions. This Court reviews criminal convictions from 12 Federal Courts of Appeals, 50 state courts of last resort, and the District of Columbia Court of Appeals. If one or even many of these courts uphold a particular type of search or seizure, *defendants in jurisdictions in which the question remains open will still have an undiminished incentive to litigate the issue.* This Court can then grant certiorari, and the development of Fourth Amendment law will in no way be stunted." *Id.* at 2433.

(Fn. omitted, emphasis added.) *Id.* at ¶ 17.

{¶ 76} Referencing the italicized portion of the *Davis* opinion, the *Henry* court concluded that the good-faith exception "has no application in a situation, like the one before us, where the jurisdiction in which the search was conducted has no binding judicial authority upholding the search." *Id.*

{¶ 77} In *Allen,* the Eleventh District Court of Appeals, following *Henry,* held that "only binding appellate precedent can be cited to support a good-faith argument." *Allen,* 2013-Ohio-434, ¶ 6. The court averred that, because the Supreme Court of Ohio, the Sixth Circuit Court of Appeals, and the Eleventh District Court of Appeals had never addressed the GPS issue prior to the *Jones* decision, "there was no binding precedent in this jurisdiction concluding that the employment of a GPS tracking device does not constitute a 'search,' making a warrant unnecessary." *Id.* at ¶ 32. Accordingly, the court concluded that the good-faith exception was not available. *Id.*

{¶ 78} In *Allen*, the Eighth District Court of Appeals rejected the state's proposal that the court adopt a broad reading of *Davis*–one permitting application of the exclusionary rule based upon non-binding judicial precedent from other jurisdictions. The court observed that, at the time of the GPS monitoring, "no court of appeals in this

jurisdiction had approved the practice of attaching GPS tracking devices, and there was no controlling precedent to the contrary." *Allen*, 2013-Ohio-4188, at ¶ 32. The court averred that, "[u]ntil the United States Supreme Court addresses questions left unanswered by *Jones*, specifically, what is the proper remedy when the governing law is unsettled, we will adopt a strict reading of *Davis* and apply the exclusionary remedy to suppress evidence gathered from a warrantless GPS initiative, because no binding precedent exists in our jurisdiction prior to *Jones*." *Id.* at ¶ 33. In support, the court relied on several federal cases that had held similarly. The court particularly cited the reasoning in *United States v. Katzin,* E.D. Pa. No. 11-226, (May 9, 2012):

> The risk of institutionalizing a policy of permitting reliance on non-binding authority, particularly in the face of other, contrary non-binding authority, at least borders on being categorized as systemic negligence. * * * Indeed, opening to the Government the shelter of the good-faith exception in this case would encourage law enforcement to beg forgiveness, rather than ask permission in ambiguous situations involving basic civil rights.[4]

{¶ 79} We concur in the decisions of our sister districts in *Henry, Allen* and *Allen* and, accordingly, hold that, in the absence of "binding appellate precedent" authorizing the warrantless installation and monitoring of a GPS device, the good-faith exception to the exclusionary rule does not apply. In the instant case, at the time the GPS device was attached to defendant's vehicle, January 14, 2010, no "binding appellate precedent" authorized the warrantless attachment and monitoring of a GPS device. Even assuming the cases relied upon by the state had been decided before the GPS was attached and/or were otherwise applicable, none constitute "binding appellate precedent" applicable to this case, having not been decided by the United States Supreme Court, the Supreme Court of Ohio, or the Tenth District Court of Appeals.

{¶ 80} We note, however, that one Ohio appellate court has taken a different view. In *State v. Johnson*, 12th Dist. No. 2012-11-235, 2013-Ohio-4865 ("*Johnson II*"), a law

---

[4] In *United States v Katzin*, 732 F.3d 187 (3d Cir.2013), the Third Circuit Court of Appeals expanded upon the reasoning of the district court above-quoted, rejecting the government's contention, inter alia*,* that the good-faith exception applies when police act in objectively reasonable reliance on out-of-circuit precedent sanctioning warrantless GPS surveillance. *Id.* at 208. However, the Third Circuit later withdrew the published panel opinion, scheduling further proceedings en banc for May 28, 2014.

enforcement officer, based upon information obtained from multiple confidential informants, and without obtaining a warrant, attached a GPS device to Johnson's vehicle and monitored its ensuing travels. The court held that the good-faith exception to the exclusionary rule applied to evidence obtained from the GPS monitoring. The court acknowledged that, at the time of the warrantless GPS attachment and monitoring, no Ohio Supreme Court or Twelfth District Court of Appeals case law authorized such a practice. However, the court, applying a broad construction of *Davis,* concluded that the officer did not act with a "deliberate," "reckless," or "grossly negligent" disregard of Johnson's Fourth Amendment rights.

{¶ 81} In so concluding, the court noted the officer's testimony that he had previously attached GPS devices to suspects' vehicles without obtaining a warrant and had consulted with an assistant prosecutor and other law enforcement officers and agencies about the legality of using GPS devices before attaching the GPS in the present case. The court further observed that the officer's belief that a warrant was unnecessary "was not unfounded given the legal landscape that existed at the time the GPS device was placed on Johnson's car." *Id.* at ¶ 26. The "legal landscape" to which the court referred consisted of the Supreme Court's decision in *Knotts* and one circuit court case (*Garcia,* 474 F.3d 994) upholding the warrantless placement and subsequent monitoring of a GPS device on a suspect's vehicle. The court stated at ¶ 30:

> Given that, at the time [the officer] attached the GPS device to Johnson's vehicle, the United States Supreme Court had sanctioned the use of beeper technology without a warrant in *Knotts,* at least one circuit court had applied the rationale expressed in *Knotts* and determined that the warrantless placement and subsequent monitoring of a GPS device on a vehicle was not a violation of a defendant's Fourth Amendment rights, and [the officer] acted only after consulting with fellow officers, other law enforcement agencies, and a prosecutor, we find that the [officer] acted "with an objectively 'reasonable good-faith belief' that [his] conduct [was] lawful." *Davis,* 131 S.Ct. at 2427, quoting *Leon,* 468 U.S. at 909. Taking into account the steps taken by law enforcement and the legal landscape that existed at the time the GPS device was attached to Johnson's vehicle, we find that law enforcement did not exhibit a deliberate, reckless, or grossly negligent disregard for Johnson's Fourth Amendment

rights in attaching and monitoring the GPS device without the authorization of a warrant. Suppression under the facts of this case would therefore fail to yield appreciable deterrence. As such, the deterrence value does not outweigh the social costs exacted by application of the exclusionary rule, which would require the court "to ignore reliable, trustworthy evidence bearing on guilt or innocence." *Id.*

{¶ 82} For the reasons articulated by the Second, Eighth and Eleventh Districts in *Henry, Allen* and *Allen,* respectively, we decline to adopt the rationale of the Twelfth District in *Johnson II.* Because we conclude that the good-faith exception to the federal exclusionary rule does not apply, any evidence obtained as a result of the unlawful search in this case must be suppressed.

{¶ 83} The state further contends that, even if suppression of the evidence is required under the federal exclusionary rule, suppression is not justified under Ohio Constitution, Article I, Section 14. The state relies on *State v. Lindway,* 131 Ohio St. 166 (1936), in support of this argument.

{¶ 84} As the state notes, the Supreme Court of Ohio has never expressly overruled *Lindway.* However, the court's subsequent decisions appear to have significantly limited, if not altogether eliminated, its precedential value. For example, in *State v. Chatton,* 11 Ohio St.3d 59, 63, fn.4, (1984), the court, discussing the good faith exception to the federal exclusionary rule, stated that "even should a good faith exception to the exclusionary rule be recognized for Fourth Amendment purposes, the question still remains whether we would likewise recognize such an exception under Section 14, Article I of the Ohio Constitution." Similarly, in *State v. Perkins,* 18 Ohio St.3d 193 (1985), the court, finding Section 14, Article I of the Ohio Constitution to be coextensive with the Fourth Amendment, held that the inevitable discovery exception to the federal exclusionary rule, as announced in *Nix v. Williams,* 467 U.S. 431 (1984), would be adopted under Ohio law. Although neither *Chatton* nor *Perkins* expressly addressed *Lindway,* there would have been no need for the court to determine the applicability of the good-faith or the inevitable discovery exceptions in the absence of an Ohio exclusionary rule.

{¶ 85} Moreover, Ohio appellate courts considering *Lindway* have acknowledged its diminished precedential value.  In *State v. Watson*, 117 Ohio App. 333 (9th Dist.1962), the court noted that the Supreme Court of Ohio had followed *Lindway* in *State v. Mapp,* 170 Ohio St. 427 (1960), but that the United States Supreme Court, "in reversing the Supreme Court of Ohio, held, in effect, that all evidence obtained by searches and seizures in violation of the Fourth Amendment of the Federal Constitution is, by virtue of the due process clause of the Fourteenth Amendment, guaranteeing the right to privacy free from unreasonable state intrusion, *inadmissible in a state court.*" (Emphasis sic.)  *Watson,* at 338, citing *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684 (1961).  The court found that "[a]s a consequence of [*Mapp*], the rule of *State v. Lindway* * * * no longer prevails in this state. Evidence obtained by an unlawful search and seizure is now inadmissible in a state court, as it is in a federal court."  *Id*. at 339.  *State v. McCarthy,* 20 Ohio App.2d 275 (8th Dist.1969), held similarly.  The court noted that, at the time *Lindway* was decided, the Fourth Amendment did not apply to the states.  The court averred that "the importance of [*Lindway*] has diminished considerably with the decision of *Mapp v. Ohio* * * * applying the protections of the Fourth Amendment to the states."  *Id*. at 281.

{¶ 86} Given the foregoing, we decline the state's invitation to apply *Lindway* here.

{¶ 87} The third assignment of error is overruled.

## IV. CONCLUSION

{¶ 88} Having overruled the state's three assignments of error, we hereby affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

DORRIAN and O'GRADY, JJ., concur.

T. BRYANT, J., retired, of the Third Appellate District, assigned to active duty under the authority of the Ohio Constitution, Article IV, Section 6(C).

—————————————